In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1402

Ronald C. Denius,

Plaintiff-Appellant,

v.

Wayne Dunlap and Gary Sadler/1,

Defendants-Appellees.

Appeal from the United States District Court
for the Central District of Illinois, Urbana Division.
No. 97-C-2088--Harold A. Baker, Judge.

Argued January 6, 2000--Decided April 11, 2000

Before Coffey, Flaum and Kanne Circuit Judges.

Flaum, Circuit Judge.  Ronald Denius filed suit
against Wayne Dunlap in his individual and
official capacity as director of the Lincoln
Challenge Program ("LCP") seeking injunctive,
declaratory and monetary relief under 42 U.S.C.
sec.sec. 1983 and 1988. Denius alleges that
Dunlap violated his constitutional rights when
Dunlap refused to renew his employment contract.
The district court granted summary judgment in
favor of the defendant on qualified immunity
grounds. For the reasons stated herein, we affirm
in part and reverse and remand in part.

I.  BACKGROUND

The LCP is an eighteen-month program for 16 to
18 year old high school dropouts located on the
premises of the now-closed Chanute Air Force
Base. Students participating in the LCP live on
campus for the first five months of the program
and then live off campus for the remainder of the
program under the supervision of mentors. The LCP
uses a military training method with the goal of
teaching "life skills" instead of military skills
and has as its objective that all participants
obtain a GED. By 1996, the LCP had two 400
student classes each year. In 1996, the LCP
received 100 percent of its funding from the
federal government but was administered by the
State of Illinois. Students who have felony
convictions are not eligible to participate in

the LCP.

In 1993, Wayne Dunlap, an Army colonel, became the director of the LCP. Dunlap retired from the Army in 1994 but continued to serve as director of the LCP, becoming an employee of the State of Illinois.

Ronald Denius is a retired Air Force technical sergeant who has earned two bachelor's degrees and a master's degree. At the time he retired from the Air Force, Denius had a "top secret" security clearance. In March 1994, Denius began work as a teacher at the LCP under a three-month contract that was to last until the end of that school year. Denius taught math, science, social studies, language arts and writing skills. Denius did not carry a weapon or have any duties beyond those of a typical teacher.

On July 1, 1994, Denius signed a two-year contract to continue teaching at the LCP. At this time, he signed a release form that authorized the LCP to perform a criminal background check and collect his educational records (the "1994 Release"). This release did not contain a time limitation. Criminal background checks were performed on the initial group of LCP instructors in 1994, but no further criminal background checks were performed on LCP personnel until 1996.

In July of 1996, Denius was offered the opportunity to renew his teaching contract with the LCP provided he sign an Authorization for Release of Personal Information ("Authorization"). This Authorization required Denius to consent to the release of considerably more confidential information than provided in the 1994 Release. LCP Director Dunlap had acquired the Authorization from Captain John Moraitis of the Illinois State Police who informed Dunlap that the Authorization was used by the police for background checks of gubernatorial candidates and applicants for employment with the State Police. Moraitis suggested that Dunlap consult an attorney before using the Authorization at the LCP, but Dunlap did not heed this advice.

The Authorization provided in pertinent part:

For the period of one year from the execution of this form I _____, do hereby authorize a review of and full disclosure of all records concerning myself to any duly authorized agent of the Lincoln Challenge Program, whether the said records are of a public, private or confidential nature.

The intent of this authorization is to give my consent for full and complete disclosure of records of educational institutions; financial or credit institutions, including records of loans, the records of commercial or retail credit agencies (including credit reports and/or ratings); and other financial statements and records wherever filed; records maintained by the National Personnel Records Center, the U.S. Veteran's Administration, and County, State or Federal Law Enforcement Agencies; employment and pre-employment records, including background reports, efficiency ratings, complaints or grievances filed by or against me and the records and recollections of attorneys at law, or of other counsel, whether representing me or another person in any case, either criminal or civil, in which I presently have, or have had an interest.

. . . I also certify that any person(s) who may furnish such information concerning me shall not be held accountable for giving this information; and I do hereby release said person(s) from any and all liability which may be incurred as a result of furnishing such information. I further release the Lincoln Challenge Program from any and all liability which may be incurred as a result of collecting such information.

Denius signed the 1996 employment contract but refused to sign the Authorization. Dunlap told Denius that his contract was not valid unless he signed the Authorization. Denius attempted to resume his teaching responsibilities on August 2, 1996, the beginning of the school term for that year. When he did so, Dunlap informed Denius that he could not be employed by the LCP unless he signed the Authorization, and he asked Denius to leave the LCP premises. Denius's refusal to sign the Authorization was the sole reason his employment contract with the LCP was not renewed.

At the time he required Denius to sign the Authorization, Dunlap did not intend to use it for any purpose other than to perform a routine criminal background check because the LCP did not have the funds to perform a more thorough background investigation. If the LCP had possessed the funds, Dunlap would have conducted a more extensive background check. However, Dunlap did not tell Denius that he only intended to use the Authorization for a routine criminal background check.

Denius filed suit under 42 U.S.C. sec.sec. 1983 and 1988 asserting that Dunlap had violated his constitutional rights under the First, Sixth and Fourteenth Amendments by refusing to renew his employment contract unless he signed the Authorization. Denius sought injunctive,

declaratory and monetary relief. The district court granted summary judgment in favor of Dunlap, finding that Dunlap was entitled to qualified immunity for all of the claims brought by Denius. Denius now appeals.

## II. DISCUSSION

### A. Standard of Review

The district court granted summary judgment to the defendant and denied summary judgment to the plaintiff. We review a district court's summary judgment decisions de novo. See Henderson v. Sheahan, 196 F.3d 839, 848 (7th Cir. 1999). In conducting our evaluation, we view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

### B. Monetary Relief

The district court concluded that Denius's suit for monetary damages was barred because Dunlap was protected by qualified immunity. Denius argues that the district court erred in reaching this conclusion.

### 1. Qualified Immunity

The doctrine of qualified immunity is an affirmative defense to allegations that a state official violated the constitutional rights of a plaintiff. Siegert v. Gilley, 500 U.S. 226, 231 (1991); Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982). This defense is available only to state officials who occupy positions with discretionary or policymaking authority, and it protects those individuals solely when they are acting in their official capacity. Harlow, 457 U.S. at 816. These officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818; see Wilson v. Layne, 119 S.Ct. 1692, 1696 (1999); Anderson v. Creighton, 483 U.S. 635, 638 (1987).

To evaluate a claim of qualified immunity, we engage in a two-step analysis. First, we determine whether the plaintiff's claim states a violation of his constitutional rights. Then, we determine whether those rights were clearly established at the time the violation occurred. See Wilson, 119 S.Ct. at 1697; Khuans v. School Dist. 100, 123 F.3d 1010, 1013 (7th Cir. 1997). If the rights were clearly established, the official may be liable for monetary damages and the suit proceeds to the next stage. If the

rights were not clearly established, then the official is immune from suit and the claim is dismissed. See Richardson v. McKnight, 521 U.S. 399, 403 (1997) ("[A] legal defense may well involve 'the essence of the wrong,' while an immunity frees one who enjoys it from a lawsuit whether or not he acted wrongly."). Because the doctrine of qualified immunity should not stand as an impediment to the clarification and evolution of a court's articulation of constitutional principles, we evaluate the constitutionality of the official's conduct even though, in the end, he may not be held liable for monetary damages flowing from that conduct. See Wilson, 119 S.Ct. at 1697 ("Deciding the constitutional question before addressing the qualified immunity question . . . promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public."); County of Sacramento v. Lewis, 118 S.Ct. 1708, 1714 n.5 (1998).

It is the plaintiff's burden to demonstrate the existence of a clearly established constitutional right. Kernats v. O'Sullivan, 35 F.3d 1171, 1176 (7th Cir. 1994). A clearly established right is one where "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640; see Wilson, 119 S.Ct. at 1700. To determine whether a right is clearly established, we look first to controlling Supreme Court precedent and our own circuit decisions on the issue. Because there is an almost infinite variety of factual scenarios that may be brought into the courtroom, a plaintiff need not point to cases that are identical to the presently alleged constitutional violation. However, "the contours of the right must have been established so that the unlawfulness of the defendant's conduct would have been apparent in light of existing law." Cleveland-Perdue v. Brutsche, 881 F.2d 427, 430 (7th Cir. 1989).

In the absence of controlling precedent, we broaden our survey to include all relevant caselaw in order to determine "whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." Id. at 431. A split among courts regarding the constitutionality of conduct analogous to the conduct in question is an indication that the right was not clearly established at the time of the alleged violation. See Wilson, 119 S.Ct. at 1701 ("If judges thus disagree on a constitutional question, it is unfair to subject [the defendant] to money damages for picking the losing side of the

controversy."). In some rare cases, where the constitutional violation is patently obvious, the plaintiff may not be required to present the court with any analogous cases, as widespread compliance with a clearly apparent law may have prevented the issue from previously being litigated. See Kernats, 35 F.3d at 1176.

The plaintiff Denius alleges that the defendant director of a state-run and federally-funded educational institution abused his position of authority by requiring the plaintiff to sign the Authorization as a condition of employment in violation of his constitutional rights. In response to these allegations, the defendant Dunlap asserts qualified immunity as an affirmative defense. It is unquestioned that Dunlap, as the director of a public school, is entitled to qualified immunity for the decisions he makes in hiring and firing the employees under his supervision. See Khuans, 123 F.3d at 1013 (holding that a school superintendent making the decision not to renew the contract of a school psychologist was "a government official performing discretionary functions" who was entitled to qualified immunity). Thus, even if we find that Dunlap violated Denius's constitutional rights by requiring him to sign the Authorization, Dunlap is immune from suit for damages under sec. 1983 if those rights were not clearly established at the time in question.

2.  Pickering Balancing Test

It is clearly established that a public school teacher cannot have his employment conditioned upon his relinquishment of a constitutional right unless the interest of the school "as an employer, in promoting the efficiency of the public services it performs through its employees," outweighs the individual interests of the teacher in asserting his constitutional rights. Pickering v. Board of Educ. of Township High Sch. Dist. 205, 391 U.S. 563, 568 (1968); see Abood v. Detroit Bd. of Educ., 431 U.S. 209, 234 (1977); Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283-84 (1977); Shelton v. Tucker, 364 U.S. 479, 488 (1960). At this stage of the proceedings, the defendant has articulated no interest that the LCP has in obtaining the information it was permitted to gather through the Authorization. Dunlap stated that he did not intend to use any additional information beyond that which Denius had already consented to release for the initial 1994 background check, and Dunlap did not present any other justification for requiring the information./2 Because Dunlap has articulated no interest that is promoted by requiring Denius to sign the Authorization, it is unnecessary for us

to determine at this time whether the interests of the LCP as an employer outweigh the constitutional rights of Denius.

Dunlap acknowledges that the only reason Denius was dismissed from his teaching position was his refusal to sign the Authorization./3 Therefore, if a finding that Denius has a clearly established constitutional right not to sign the Authorization is made, then it follows that conditioning his employment as a public school teacher on the relinquishment of that right without any justification is a violation of a clearly established right for which Dunlap cannot receive qualified immunity. See Keyishian v. Board of Regents, 385 U.S. 589, 605-06 (1967) ("[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.") (citations omitted).

We now examine each of Denius's constitutional claims to determine: 1) whether a constitutional right exists; and 2) whether that right was clearly established at the time in question.

3. Attorney-Client Privilege

The Authorization requires that Denius "give [his] consent for full and complete disclosure of . . . the records and recollections of attorneys at law, or of other counsel, whether representing [him] or another person in any case, either criminal or civil, in which [he] presently [has] or [has] had an interest." Denius argues that the intent and effect of this section of the Authorization is to require him to waive his attorney-client privilege and allow the state access to all information that would otherwise be protected by this doctrine. Denius contends that this compelled waiver violates his constitutional rights under the First and Sixth Amendments as applied to the states through the Fourteenth Amendment. See, e.g., Gideon v. Wainwright, 372 U.S. 335 (1963); Edwards v. South Carolina, 372 U.S. 229 (1963).

Under the doctrine of attorney-client privilege, confidential communications between a client and an attorney for the purpose of obtaining legal advice are privileged. A court cannot compel revelation of these communications through discovery or testimony in civil or criminal matters. This doctrine is a common law privilege that can be explicitly or implicitly waived by the client and is subject to a number of restrictions and exceptions. The privilege is implicitly waived if the client communicates information to his attorney without the intent that that information remain confidential. See

generally Moore's Federal Practice 3d sec. 26.49; Weinstein's Federal Evidence 2d ch. 503.

In this case, we agree that Denius has been asked to waive his privilege of confidentiality regarding the information he communicates to an attorney as a condition of employment with the LCP. If Denius were to sign the Authorization, all previously protected communications with his attorney would no longer be privileged. Furthermore, the Authorization may jeopardize the attorney-client privilege for all future communications. Because these communications would be made with the knowledge that Denius has given consent for his attorney to transmit the information to the LCD, they are no longer confidential and, therefore, not protected by the privilege. See Weinstein's Federal Evidence sec. 503.15(2); United States v. Lawless, 709 F.2d 485, 487 (7th Cir. 1983) ("When information is transmitted to an attorney with the intent that the information will be transmitted to a third party . . . , such information is not confidential.")./4

We now consider whether this mandatory waiver of the attorney-client privilege violates Denius's constitutional rights. Denius contends that the attorney-client privilege implicates his right to counsel under the Sixth Amendment as well as his rights of free speech, association and petition under the First Amendment. We address each of these arguments in turn.


a.   Sixth Amendment

The Authorization includes the release of information related to all legal matters "either civil or criminal." Where the Sixth Amendment right to the effective assistance of counsel attaches, this right includes the ability to speak candidly and confidentially with counsel free from unreasonable government interference. See Adams v. Carlson, 488 F.2d 619, 630-31 (7th Cir. 1973) (recognizing confidentiality in the attorney-client relationship as an essential component of the Sixth Amendment right to effective assistance of counsel); cf. Weatherford v. Bursey, 429 U.S. 545, 552 (1977) (recognizing that state interference with confidential attorney-client communications implicates a defendant's Sixth Amendment right to effective assistance of counsel and may in some circumstances require the reversal of a conviction). However, an individual enjoys no protection provided by the Sixth Amendment until the instigation of criminal proceedings against him. See McNeil v. Wisconsin, 501 U.S. 171, 175 (1991); Hannah v. Larche, 363 U.S. 420, 440 n.16

(1960). As Denius has at no time been the subject of a criminal prosecution, his Sixth Amendment rights are not implicated./5

    b.  First Amendment

Denius next contends that requiring him to sign the Authorization and waive his attorney-client privilege as a condition of employment violates his First Amendment rights of speech, association and petition.

The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition. See DeLoach v. Bevers, 922 F.2d 618, 620 (10th Cir. 1990) ("The right to retain and consult an attorney . . . implicates not only the Sixth Amendment but also clearly established First Amendment rights of association and free speech."); Martin v. Lauer, 686 F.2d 24, 32 (D.C. Cir. 1982). It has long been recognized that the First Amendment prohibits the state from interfering with collective action by individuals to seek legal advice and retain legal counsel. See United Transp. Union v. State Bar of Mich., 401 U.S. 576, 585-86 (1971) ("[C]ollective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment."); United Mine Workers of Am. v. Illinois State Bar Ass'n, 389 U.S. 217, 221-22 (1967) ("[T]he freedom of speech, assembly, and petition guaranteed by the First and Fourteenth Amendments gives petitioner the right to hire attorneys on a salary basis to assist its members in the assertion of their legal rights."); see also Brotherhood of R.R. Trainmen v. Virginia, 377 U.S. 1, 6 (1964); NAACP v. Button, 371 U.S. 415, 429-30 (1963). Likewise, the state cannot impede an individual's ability to consult with counsel on legal matters. See Bates v. State Bar of Ariz., 433 U.S. 350, 376 n.32 (1977) ("Underlying [the collective action cases] was the Court's concern that the aggrieved receive information regarding their legal rights and the means of effectuating them. This concern applies with at least as much force to aggrieved individuals as it does to groups."); see also Trainmen, 377 U.S. at 7 ("A State could not . . . infringe in any way the right of individuals and the public to be fairly represented in lawsuits . . . ."). Furthermore, the right to obtain legal advice does not depend on the purpose for which the advice is sought. This right applies equally to legal representation intended to advocate a political or social belief, see Button, 371 U.S. at 419-20, or to recover damages in a personal injury suit, see United Mine Workers, 389 U.S. at 223. See also id. (stating that in earlier cases "we rejected

the contention . . . that the principles announced in Button were applicable only to litigation for political purposes"). In sum, the First Amendment protects the right of an individual or group to consult with an attorney on any legal matter.

The ability to maintain confidentiality in attorney-client communications is an important component of the right to obtain legal advice. "[T]he right to confer with counsel would be hollow if those consulting counsel could not speak freely about their legal problems." Martin, 686 F.2d at 32. The centrality of confidentiality to the effective rendering of legal advice is reflected in the long-standing common law privilege for attorney-client communications. See Swidler & Berlin v. United States, 524 U.S. 399, 403 (1998). This privilege not only protects the interest of the client in receiving the best legal advice but also "'promote[s] broader public interests in the observance of law and the administration of justice.'" Id. (quoting Upjohn Co. v. United States, 449 U.S. 383, 389 (1981)). Because the maintenance of confidentiality in attorney-client communications is vital to the ability of an attorney to effectively counsel her client, interference with this confidentiality impedes the client's First Amendment right to obtain legal advice.

The First Amendment may be implicated where the state compels an individual to speak. If by compelling an individual to reveal information that he would rather keep confidential the state chills the individual's ability to engage in protected speech, the state has infringed the individual's First Amendment right in the protected speech, unless it provides a sufficient justification for the required disclosure. See McIntyre v. Ohio Elections Comm., 514 U.S. 334, 341-42 (1994); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 462-63 (1958). The level of justification required by the state will vary depending on the nature of the speech involved. See McIntyre, 514 U.S. at 347.

In this case, Denius alleges that the state is compelling the revelation of information he would prefer to keep confidential by requiring him to waive his attorney-client privilege. He argues that this compelled revelation of confidential communications chills the protected speech involved in his consultation with an attorney on legal matters. At this stage of the proceedings, Dunlap has offered no reason for requiring that Denius waive his attorney-client privilege. Therefore, we need not decide and do not address the level of justification required for the state to overcome an individual's right to maintain

confidentiality in his legal communications with his attorney. We merely conclude that absent appropriate justification the state cannot compel the revelation of privileged attorney-client communications. Therefore, if the LCP had no basis for requiring Denius to reveal confidential attorney-client communications, Dunlap violated Denius's First Amendment rights when he refused to renew Denius's contract solely because Denius declined to waive his attorney-client privilege.

However, the parameters of an individual's First Amendment right to confidential communications with his attorney were not clearly defined before this incident occurred. There is no existing Supreme Court or Seventh Circuit precedent on this issue, and we are only able to find two cases from fellow circuit courts articulating this right. See DeLoach v. Bevers, 922 F.2d 618, 620 (10th Cir. 1990); Martin v. Lauer, 686 F.2d 24 (D.C. Cir. 1982). These two cases do not represent a trend in the law that would inevitably lead to the result we announce here. Similarly, the constitutional dimensions of the attorney-client privilege are not so patently obvious that no existing case law is required to show the right is clearly established. Therefore, we also hold that Dunlap is shielded by qualified immunity for any possible violation of Denius's First Amendment right to confidential communications with his attorney, and we affirm the district court's grant of summary judgment to the defendant on this issue.

4.  Other disclosures

In addition to requiring that Denius waive his attorney-client privilege, the Authorization also permits the release of other confidential information including all records pertaining to: 1) educational, 2) financial, 3) military/veterans, 4) criminal, or 5) employment matters./6 Again, the LCD proffers no justification at this stage for requiring disclosure of this broad range of information. Denius contends that requiring him to authorize these disclosures violates his right to privacy in confidential information.

The "concept of ordered liberty" protected by the Fourteenth Amendment's Due Process Clause has been interpreted to include "the individual interest in avoiding disclosure of personal matters." Whalen v. Roe, 429 U.S. 589, 599-600 (1977); see also Nixon v. Administrator of General Servs., 433 U.S. 425, 465 (1977) (recognizing "a legitimate expectation of privacy in [ ] personal communications"); Pesce v. J. Sterling Morton High Sch., 830 F.2d 789, 795 (7th Cir. 1987) ("The federal constitution does, of course, protect certain rights of privacy

including a right of confidentiality in certain types of information."). This Court has recognized that "the federal right of confidentiality might in some circumstances be implicated when a state conditions continued employment on the disclosure of private information." Pesce, 830 F.2d at 797.

However, the scope and contours of this right have not been defined in this Circuit. For example, it is not clear whether the right of confidentiality covers all confidential information or only confidential information relating to certain matters. In this Circuit, the right clearly covers medical records and communications. See Anderson v. Romero, 72 F.3d 518, 522 (7th Cir. 1995) (noting the recognition of this right as early as 1992); Schaill v. Tippecanoe County Sch. Corp., 864 F.2d 1309, 1322 n.19 (7th Cir. 1989) (recognizing "a substantial privacy interest in the confidentiality of medical information"). But, it is not clear whether other confidential information, such as that contained in financial records, also receives similar protection under this right. Furthermore, while it is apparent that some form of balancing test would be used to determine when this right of confidentiality has been violated, that test has not been defined in this Circuit. See Pesce, 830 F.2d at 797 n.5 (noting that other courts have used either a "general balancing of interests" or strict scrutiny when addressing this right, and declining to define a test for use in this Circuit); see also Fraternal Order of Police v. City of Philadelphia, 812 F.2d 105, 110 (3d Cir. 1987) (noting that the majority of circuits have adopted intermediate scrutiny for required disclosures of confidential information and that some circuits have employed a compelling interest test where the intrusion was particularly egregious); cf. Nixon, 433 U.S. at 465 (balancing interests); Whalen, 429 U.S. at 601-04 (same)./7

Denius argues that it is clearly established that the state could not require the release of confidential information without at least some interest to place in the balance and some measures limiting the use of the information and protecting it from further disclosure. Although Denius alludes in his brief to the Authorization's effect on his privacy rights in a broad range of confidential information, he only discusses with specificity his interest in medical and financial information. Therefore, we address his privacy argument with respect to these two types of information alone. See Gagan v. American Cablevision, Inc., 77 F.3d 951, 965 (7th Cir. 1996) (holding that failure to adequately develop an argument on appeal

constitutes waiver).

### a. Medical Information

As discussed above, this Circuit has outlined a clearly established "substantial" right in the confidentiality of medical information that can only be overcome by a sufficiently strong state interest. See Anderson, 72 F.3d at 522. Therefore, to the extent that the Authorization provided for the release of medical records or communications,/8 Dunlap was on notice that this type of information has constitutional protection in this Circuit and that the state cannot require its disclosure without a sufficient countervailing interest. As Dunlap has provided no interest at this stage in the proceedings that would justify requiring Denius to supply this information, we find he has not shown that he is entitled to qualified immunity on this issue. See Gustafson v. Jones, 117 F.3d 1015, 1021 (7th Cir. 1997) (recognizing that balancing tests "produce a wide gray area between the clearly legal and the clearly illegal . . . . This does not mean, however, that legal certainty never exists when the law demands the consideration of a number of different factors."). We thus reverse the district court's grant of summary judgment to the defendant on this issue and remand for further proceedings.

### b. Financial Information

While this Court has concluded that there is a general federal constitutional right of confidentiality, we have discussed this right only in the context of confidential medical information. See Anderson, 72 F.3d 518; Schaill, 864 F.2d at 1322 n.19; Pesce, 830 F.2d 789. Denius now urges us to find that the right of confidentiality applies to confidential financial information.

Seven of our sister circuits have found that the constitutional right of privacy in confidential information covers some financial disclosures. See Sheets v. Salt Lake County, 45 F.3d 1383, 1388 (10th Cir. 1995) (finding a constitutionally protected privacy interest in matters concerning "marriage, finances, and business"); Doe v. City of New York, 15 F.3d 264, 267 (2d Cir. 1994) (recognizing a constitutionally protected privacy interest in financial information); Alexander v. Peffer, 993 F.2d 1348 (8th Cir. 1993) (recognizing a constitutionally protected privacy interest in "highly personal medical or financial information"); Walls v. City of Petersburg, 895

F.2d 188, 194 (4th Cir. 1990) (same); Fraternal Order of Police v. City of Philadelphia, 812 F.2d 105, 115 (3d Cir. 1987) (same); Plante v. Gonzalez, 575 F.2d 1119, 1135 (5th Cir. 1978) (recognizing a "substantial" privacy interest in confidential financial information); see also James v. City of Douglas, 941 F.2d 1539, 1543 n.7 (11th Cir. 1991) (recognizing Fifth Circuit precedent in this area finding a right to privacy in confidential financial information as binding). The only circuit to explicitly disavow such a right, and the right of confidentiality in general, is the Sixth Circuit. See J.P. v. DeSanti, 653 F.2d 1080, 1090 (6th Cir. 1981) (finding that no right of confidentiality exists under the federal constitution); Cushall v. Sundquist, 193 F.3d 466, 481 (6th Cir. 1999) (recognizing the continued vitality of the DeSanti decision). However, we explicitly recognized our disagreement with the Sixth Circuit's approach in Anderson where we agreed with the majority of circuits that Whalen and Nixon delineate a federal right of confidentiality. 72 F.3d at 522./9

The Supreme Court has discussed the existence and extent of constitutional protection for confidential information in terms of the type of information involved and the reasonable expectation that that information would remain confidential. Nixon, 433 U.S. at 465; see also Whalen, 429 U.S. at 604. Following this logic, we held that medical information may be a form of protected confidential information because of its intimate and personal nature. See Anderson, 72 F.3d at 522; Pesce, 830 F.2d at 797. Our fellow circuit courts have applied similar reasoning to determine whether information may receive protection under the confidentiality branch of the right to privacy. See In re Crawford, 194 F.3d at 959; Doe, 15 F.3d at 267; Walls, 895 F.2d at 192, 194; Westinghouse, 638 F.2d at 579; Plante, 575 F.2d at 1134-35. Because confidential financial information may implicate substantial privacy concerns and impact other fundamental rights, we agree with the overwhelming majority of our sister circuits that some types of financial information involve the degree and kind of confidentiality that is entitled to a measure of protection under the federal constitutional right of privacy.

In this case, the plaintiff has identified no specific financial information that he claims deserves constitutional protection. However, the Authorization provides for the release of a virtually limitless range of confidential financial information. Furthermore, the LCD has provided no basis for requiring this information and no explanation for how it would tailor the

gathering of the information to any need it might proffer. Most importantly, the LCD has provided no guarantee that the information obtained pursuant to the Authorization would be kept confidential and only used for a legitimate government purpose. We conclude that this sweeping disclosure requirement, lacking any safeguards against misuse or further disclosure, and supported by no justification, infringes Denius's right of privacy in confidential information.

That some forms of confidential financial information may fall within the scope of the right of privacy was not clear in this Circuit at the time Dunlap made his decision not to renew Denius's contract. While there was a trend among the majority of circuits in this direction, the conclusion was not unanimous. Therefore, we do not find that the law in this area was so clearly defined that a government official can be charged with its knowledge. We conclude that Dunlap is shielded by qualified immunity for requiring Denius to disclose confidential financial information as a condition of employment, and we affirm the district court's grant of summary judgment to the defendant on this issue./10

C.  Equitable Relief

Denius next argues that the district court erred as a matter of law when it dismissed his claims for equitable relief as barred by the defendant's qualified immunity.

1.  Waiver

The defendant contends that Denius waived his right to appeal this issue because the district court's dismissal of Denius's claims for equitable relief was an oversight and not a legal judgment. The defendant asserts that Denius was required to file a Rule 60(b) Motion for Relief from Judgment calling the district court's attention to this oversight and requesting its correction. The defendant argues that by failing to make a Rule 60(b) motion, Denius waived his ability to raise this argument on appeal.

The defendant is correct that where a plaintiff is seeking relief from judgment that is most appropriately awarded by a trial court on a Rule 60 motion, such as where the plaintiff is claiming oversight, mistake or clerical error, the plaintiff may waive his right to present that type of argument on appeal if he did not make the appropriate Rule 60 motion below. See Chicago Downs Ass'n, Inc. v. Chase, 944 F.2d 366, 370-71 (7th Cir. 1991) (finding that where plaintiff's only argument on appeal was that the district

court's judgment was inequitable because of attorney neglect, plaintiff waived this Rule 60(b)-type argument on appeal because he failed to make the appropriate motion below); see also Securities and Exchange Comm'n v. Mayhew, 121 F.3d 44, 53-54 (2d Cir. 1997). However, in this case, Denius is not contending that the district court overlooked his claim for declaratory and injunctive relief or issued a mistaken judgment for any of the reasons that would properly be corrected by a Rule 60 motion. Rather, he claims that the district court was fully aware of his claims for both equitable and monetary relief but erroneously concluded that qualified immunity was a bar to claims in both law and equity.

We agree with Denius's interpretation of the district court's ruling. This is not a case where the district court completely overlooked plaintiff's claims for equitable relief. The district court clearly states that it is disposing of Denius's claims for monetary and equitable relief through its summary judgment opinion. In addition, the district court did not limit its discussion of qualified immunity solely to Denius's claims for monetary relief but applied that doctrine to all of Denius's claims. Furthermore, oral argument before the trial court pertaining to the motion for summary judgment clearly indicates that the district court was aware of, and took into consideration, Denius's claims for equitable as well as monetary relief. Denius appealed the district court's conclusion of law on this matter directly to this Court, and it was proper for him to do so. While he may have filed a Rule 60(b) motion asking the district court to reconsider this conclusion of law, he was not required to do so, and he has not waived any of his arguments related to this matter on appeal. See Meinecke v. H & R Block of Houston, 66 F.3d 77, 82 n.2 (5th Cir. 1995) ("[I]t has never been the case that a Rule 60(b) motion must be filed as a prerequisite to appeal.").

2.  Denius's Equitable Claims

The doctrine of qualified immunity does not apply to claims for equitable relief. See Burgess v. Lowery, 2000 WL 30073, *1 (7th Cir. Jan. 18, 2000) ("There is no immunity from a suit for [equitable] relief."); Eberhardt v. O'Malley, 17 F.3d 1023, 1028 (7th Cir. 1994) (finding qualified immunity "irrelevant to the plaintiff's request for an order that he be reinstated"); see also Wood v. Strickland, 420 U.S. 308, 314 n.6 (1975) (stating that "immunity from damages does not ordinarily bar equitable relief as well"). Therefore, we hold that the district court erred in concluding that the defendants in this case are shielded from all liability for their actions

under the qualified immunity doctrine. As discussed above, Denius has a First Amendment right in confidential communications with his attorney and a Fourteenth Amendment right in maintaining the confidentiality of some medical and financial information. These rights are subject to a balancing of interests to determine whether the state has violated them. On the present record, the defendant has presented no justification for the burden he has placed on these rights by conditioning Denius's employment on relinquishing them, and he is not entitled to prevail on summary judgment. Therefore, we reverse the district court's grant of summary judgment to the defendant on Denius's claims for equitable relief and remand these claims for further proceedings.

III.  CONCLUSION

For the reasons stated above, we Affirm the district court's grant of summary judgment to the defendants on plaintiff's claims for monetary relief on the First Amendment attorney-client privilege and Fourteenth Amendment financial privacy claims; we Reverse the district court's grant of summary judgment in favor of the defendants on plaintiff's claim for monetary relief on the Fourteenth Amendment medical privacy claim as well as plaintiff's claims for equitable relief; and we Remand this case to the district court for further proceedings consistent with this opinion.

/1 Pursuant to Fed. R. App. Pro. 43(c)(2), we have added Gary Sadler, the current Director of the Lincoln Challenge Program, as a party to this action which involves claims for prospective injunctive relief as well as monetary damages. However, for purposes of our discussion we will refer to Dunlap as the defendant in this matter.

/2 The only justification revealed on the record relates to the LCP's need for information concerning the criminal background of its teachers. Denius has not objected to providing this information and, indeed, has signed a consent form without any time limit authorizing the disclosure of information regarding his criminal history. The record does not reveal any justification for requiring the additional information in the 1996 Authorization that is the subject of this appeal.

/3 It is irrelevant to our analysis that Dunlap did not fire Denius but refused to renew his contract, since Denius alleges that this decision was made solely because he chose to exercise his

constitutional rights. See Mt. Healthy, 429 U.S. at 283 (holding that a plaintiff whose contract was not renewed "may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms").

/4 The defendant contends that Denius does not have standing to raise a constitutional claim regarding the attorney-client privilege because he was not involved in any past or present legal matters at the time he was required to sign the release. However, this fact is not determinative of Denius's standing in this case. In Shelton v. Tucker, 364 U.S. 479 (1960), and Keyishian v. Board of Regents, 385 U.S. 589 (1967), the Supreme Court held that requiring a teacher to reveal his associational memberships as a condition of public employment was an unconstitutional burden on the teacher's exercise of his First Amendment rights. The holdings in these cases rest on the proposition that First Amendment activity may be unreasonably chilled when public employees are forced to choose between revealing protected activities to their employer or keeping their jobs. See Keyishian, 385 U.S. at 601-04; Shelton, 364 U.S. at 485-88; cf. NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 462 (1958). As with the associational rights in those cases, the First Amendment right in this case--the right to seek counsel from an attorney--is arguably impaired by a requirement that attorney-client communications be made available to a public employer. We are particularly concerned with a potential chilling effect in this context because in certain cases it is only through the aid of an attorney that an individual is able to determine what his rights are and how to give them effect. In neither Shelton nor Keyishian were the plaintiff teachers required to show that they were actually chilled from associating with particular groups or persons because of the challenged regulations. Rather, the plaintiffs alleged that they refused to comply with the regulations requiring disclosure of associational membership and were fired because of this refusal. Likewise, because Denius alleges that he was required to chose between signing a release that would potentially curtail an important First Amendment activity and keeping his job, we find that he has standing to assert a First Amendment claim.

/5 The fact that the Authorization may affect future communications does not alter this result with respect to the Sixth Amendment. Contrary to the First Amendment context, an individual cannot assert a claim based on a future violation of his Sixth Amendment rights. Those rights may only be

vindicated once they have attached. See McNeil, 501 U.S. at 176.

/6 To the extent that the Authorization duplicates the release of criminal and educational records that Denius signed when he first began working at LCD, he does not contest its validity. It is only the disclosure of information above and beyond that necessary to perform such a routine background check that is the subject of this appeal.

/7 In Whalen, the Supreme Court balanced the following factors: 1) the potential for public disclosure of the information; 2) the extent to which the private information is already disclosed to other individuals or institutions; 3) the similarity of the disclosure in question to disclosures that have already taken place; 4) the potential deterrent effect on the exercise of other constitutional liberties; and 5) the state's interest in the information. 429 U.S. at 601-04.

In Nixon, the factors considered were: 1) the extent of the intrusion into the individual's privacy; 2) the individual's status as a public figure; 3) the expectation of privacy in the materials in question; 4) the importance of the public interest; 5) the level of difficulty involved in segregating private from non-private materials; and 6) the measures taken to keep private materials from being publicly disseminated or revealed. 433 U.S. at 465.

A number of our sister circuits have adopted a variation of the balancing test articulated by the Third Circuit that includes: 1) "the type of record requested"; 2) "the information it does or might contain"; 3) "the potential for harm in any subsequent nonconsensual disclosure"; 4) "the injury from disclosure to the relationship in which the record was generated"; 5) "the adequacy of safeguards to prevent unauthorized disclosure"; 6) "the degree of need for access"; 7) "whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access." United States v. Westinghouse Elec. Corp., 638 F.2d 570, 578 (3d Cir. 1980); see In re Crawford, 194 F.3d 954, 959 (9th Cir. 1999).

/8 The present record does not reveal whether the Authorization extends to medical records or communications as Denius alleges. We leave this factual determination to be resolved by the district court.

/9 The District of Columbia Circuit has recently expressed "grave doubts" as to the existence of

a federal right of confidentiality. See American Fed'n of Gov't Employees v. Department of Hous. & Urban Dev., 118 F.3d 786, 791 (D.C. Cir. 1997). However, that circuit recognized that it did not "write on a blank slate" and that the circuit's earlier decisions indicated the existence of such a right. Id. at 791-92. Similarly, the First Circuit has expressed concern regarding the contours of this right but has declined to address the issue. See Borucki v. Ryan, 827 F.2d 836 (1st Cir. 1987).

/10 The Authorization also includes a release of liability to all persons giving information to the LCP pursuant to the Authorization and to the LCP for any liability incurred as a result of gathering this information. Denius contends that requiring him to release these potential legal claims interferes with his right of access to the courts and his property right in legal causes of action.

We have searched the record presented on appeal and can find no evidence that Denius raised either of these claims before the district court. We have repeatedly held that "[a]n issue not presented in the court below cannot be raised for the first time on appeal and form a basis for reversal." Weeks v. Samsung Heavy Indus. Co., Ltd., 126 F.3d 926, 942 (7th Cir. 1997) (citations omitted). Therefore, we consider these issues waived and do not address them at this time.