# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 01-3422, 01-3575, 02-1398 & 02-1460

RONALD C. DENIUS,

*Plaintiff-Appellee/Cross-Appellant,*

*v.*

WAYNE DUNLAP and PETER THOMAS,

*Defendants-Appellants/Cross-Appellees,*

and

GARY SADLER,

*Defendant-Cross-Appellee.*

———————

Appeals from the United States District Court
for the Central District of Illinois.
No. 97-2088—**Harold A. Baker**, *Judge.*

———————

ARGUED FEBRUARY 19, 2003—DECIDED MAY 30, 2003

———————

Before FLAUM, *Chief Judge*, and COFFEY and KANNE,
*Circuit Judges.*

FLAUM, *Chief Judge.* Ronald Denius claims that officials
of Illinois's Lincoln Challenge Program ("LCP") violated his
constitutional rights by requiring him to authorize the re-
lease of a broad range of personal information as a condi-

tion of continued employment. Initially, the district court granted summary judgment for the defendants on grounds of qualified immunity, but on appeal we reversed in part and remanded for further proceedings. *Denius v. Dunlap*, 209 F.3d 944 (7th Cir. 2000) ("*Denius I*"). On remand, after a jury rendered a verdict for the defendants, the district court granted Denius's motion for judgment as a matter of law ("JMOL"), a ruling from which defendants now appeal. Denius cross-appeals, seeking additional damages and attorneys' fees. We affirm the judgment in all respects.

## I. BACKGROUND

We assume familiarity with our earlier opinion and will repeat only those facts that are necessary for resolving the issues presently before us. The LCP is an eighteen-month program that uses military training methods to teach "life skills" and GED courses to teenage high school dropouts. Denius, a retired Air Force technical sergeant, began teaching at the LCP in March 1994. When his contract was due to expire in July 1996, defendant Wayne Dunlap, then Director of the LCP, offered him the opportunity for renewal provided that he sign an Authorization for Release of Personal Information ("First Authorization"), which required the disclosure of a broad range of personal information:

> For the period of one year from the execution of this form, I . . . do hereby authorize a review of and full disclosure of all records concerning myself to any duly authorized agent of the Lincoln's Challenge Program, whether said records are of a public, private or confidential nature.

> The intent of this authorization is to give my consent for full and complete disclosure of records of educational institutions; financial or credit institutions, in-

cluding records of loans, the records of commercial or retail credit agencies (including credit reports and/or ratings); and other financial statements and records wherever filed; records maintained by the National Personnel Records Center, the U.S. Veteran's Administration, and County, State or Federal Law Enforcement agencies; employment and pre-employment records, including background reports, efficiency ratings, complaints or grievances filed by or against me and the records and recollections of attorneys at law, or of other counsel, whether representing me or another person in any case, either criminal or civil, in which I presently have, or have had an interest.

Denius refused to sign the First Authorization, and Dunlap in turn refused to renew his teaching contract.

As a result Denius sued Dunlap under 42 U.S.C. § 1983, claiming violations of his constitutional rights under the First, Sixth, and Fourteenth Amendments. The district court granted summary judgment for Dunlap on the ground that Denius did not have a clearly established constitutional right to refuse to sign the First Authorization and therefore Dunlap was protected by qualified immunity, but on appeal we reversed this ruling in part. We concluded that Denius did have a clearly established right in maintaining the confidentiality of his medical information, *Denius I*, 209 F.3d at 956-57, and noted that the record as it then stood did "not reveal whether the Authorization extends to medical records or communications as Denius alleges," *id.* at 956, n.8. We therefore remanded the case for "this factual determination to be resolved by the district court." *Id.*

Following our decision in the interlocutory appeal, Denius was allowed to return to work at the LCP. Attached to his new contract, however, was another Authorization for Release of Personal Information ("Second Authorization").

The Second Authorization was similar to the First, but it omitted certain categories of information, such as financial records and attorneys' records, that *Denius I* found were constitutionally protected from compelled disclosure:

> For the term of the attached contract, I . . . do hereby authorize a review of and full disclosure of all records concerning myself to any duly authorized agent of the Lincoln's Challenge Program, whether the said records are of a public, private or confidential nature.

> The intent of this authorization is to give my consent for full and complete disclosure of records maintained by the National Personnel Records Center, the U.S. Veteran's Administration, and County, State or Federal Law Enforcement Agencies; and employment and pre-employment records, including information concerning resignation or termination from employment, background reports, efficiency ratings, and complaints or grievances filed by or against me.

Defendant Gary Sadler, who had succeeded Dunlap as Director, required LCP employees to sign the Second Authorization in order to remain employed with the program.

In June 2000 defendant Peter Thomas succeeded Sadler as LCP Director. When Denius complained to Thomas that he found the Second Authorization objectionable, Thomas replied that Denius did not have to sign it and that the entire form was being revised and would be sent to all employees when completed. Thomas then removed the Second Authorization from Denius's contract, and in August 2000 Denius returned to his teaching position. Since then, true to Thomas's word, neither the First nor the Second Authorization has been used by the LCP. Instead, the LCP began using a new release form ("Third Authorization"), which provided for a much more limited disclosure than the earlier two:

> I . . . do hereby authorize the Illinois State Police to release information relative to the existence or nonexistence of any criminal record which it might have concerning me to any Department of the State of Illinois solely to determine my suitability for employment or continued employment with the State of Illinois. I further authorize any agency which maintains records relating to me to provide same on request to the Illinois State Police for the purpose of this investigation.

LCP employees who had already signed the First or Second Authorization were never informed, however, that they could make retractions. The signed release forms remained in their personnel files.

Back before the district court, Denius amended his complaint to add Sadler and Thomas as defendants, the latter for purposes of equitable relief only. The district court dismissed Sadler from the case, ruling that his request that Denius sign the Second Authorization did not deter the exercise of any constitutional right. The remaining claims proceeded to trial, at the start of which Denius asked the court to take judicial notice that the National Personnel Records Center ("NPRC") and/or the Veteran's Administration ("VA") maintained medical records on retired military personnel. Denius based his request on information he said was taken from the official website of the National Archives and Records Administration. Initially, the court granted Denius's motion and took judicial notice that "military personnel health and medical records of veterans discharged from military service are stored at the [NPRC] or the Veteran's Administration." Later, however, the court withdrew this ruling after Denius testified that on April 30, 2001 (the day before trial), he went in person to the NPRC and obtained his medical records by providing his service dates and numbers. Because of this testimony, the court found that judicial notice was unnecessary.

At the close of evidence, both parties moved for JMOL. In support of his motion, Denius argued that "the undisputed evidence shows that the National Personnel Records Center, in fact, had [his] medical records" and that "judicial notice could and should be taken of the fact that medical records are kept at the National Personnel Records Center from the Veteran's Administration." Defendants, on the other hand, claimed that they were entitled to JMOL because, among other things, Denius failed to prove that his medical records were at the NPRC from 1996 to 1997—what would have been the effective period of the First Authorization had Denius signed it.

The court denied both parties' motions and submitted the case to the jury with the instruction that Denius had the burden of proving each of the following six facts:

(1) the First Authorization extended to medical records;

(2) Dunlap required Denius to sign the Authorization in order to continue teaching at the LCP;

(3) Denius refused to sign;

(4) Dunlap told Denius that his position at the LCP was terminated because he refused to sign;

(5) Denius suffered damages; and

(6) the termination for refusal to sign the Authorization was a proximate cause of Denius's damages.

During closing argument the defendants conceded that Denius had proved elements (2) through (4); the jury, however, apparently found that Denius had not proved at least one of the remaining three and thus rendered a verdict against him. The jury also returned a special verdict finding that the LCP was "likely in the future to require [Denius] to sign Authorizations for Release of Personal Information similar to [the First and Second Authorizations] as a condition of employment."

Following the verdict Denius renewed his motion for JMOL, and this time the court granted the motion, holding that no reasonable jury could have found that the First Authorization did not extend to medical records:

> [Denius] presented evidence that he was ordered to sign a form that specifically authorized the release of records maintained by the NPRC. He then presented evidence that the NPRC in fact had his medical records from his service in the Air Force. The defendant[s] offered no evidence to dispute this testimony. Thus, the form Denius was required to sign would have authorized the release of all records from the very agency that maintained his medical records. There is nothing in the Seventh Circuit's decision [in *Denius I*] that required the plaintiff also to show that . . . the NPRC actually housed his records at the precise moment he was asked to sign the form. . . . The uncontradicted evidence presented by the plaintiff established that the form the defendant required him to sign extended to medical records. No reasonable jury could have found otherwise.

The court also held that no reasonable factfinder could have concluded that Denius did not suffer damages as a result of the defendants' refusal to renew his contract. As an alternative to JMOL, the court granted Denius's request for a new trial, finding that the verdict was against the manifest weight of the evidence and was "a great injustice" because it "possibly" resulted from defense counsel's remarks during closing argument that Denius was seeking a verdict against Dunlap personally.

A second trial was held to determine damages. At the close of evidence, the defendants moved for JMOL on the issue of emotional damages, contending that there was insufficient evidence to justify sending the issue to the jury. The court agreed and granted the motion. The jury then awarded Denius $129,395—the exact amount of his lost wages from August 1996 to August 2000. Denius moved for

a new trial, claiming that he should have received additional damages for emotional distress, but the court denied relief. Later, the court granted Denius an injunction barring Thomas and his successors from conditioning Denius's continued employment on his authorizing the release of financial, medical, or attorney-client records. The court relied on the jury's special verdict to support the grant of injunctive relief. Further, the court stated that it "had the chance to consider the evidence and observe the trial, and it believe[d] that the defendants are capable of using a similar form in the future." In particular the court pointed to defense counsel's closing argument, which the court thought "castigate[d]" Denius and "malign[ed] [his] integrity." The court refused to grant declaratory relief, finding it would serve no additional purpose.

Defendants appeal the denial of their motion for JMOL, the grant of Denius's motion for JMOL, and the grant of his motion for injunctive relief.[1] Denius cross-appeals, seeking review of the court's denial of his motion for a new trial on damages, the denial of declaratory relief, and the court's calculation of attorneys' fees.[2]

## II. DISCUSSION

### A. *Grant of Denius's Motion for JMOL*

The defendants claim that the district court erred in granting JMOL for Denius because a reasonable jury could have concluded that he did not establish that the First Authorization extended to medical records (the first of the

---

[1]  Defendants also appealed the district court's award of attorneys' fees, but they have abandoned that issue because they failed to address it in their opening brief.

[2]  Denius has withdrawn his cross-appeal from the district court's order dismissing Sadler from the case.

six propositions that he was required to prove).[3] In support of this argument, the defendants point out that Denius "presented no evidence that the NPRC maintained his medical records between July 1996 and August 1997, the period during which the Authorization was effective," nor did he "adduce any evidence that the NPRC routinely maintained medical records of military personnel. Denius offered no evidence about the nature of the NPRC—what it is, how it operates, who runs it. He called no witness with any personal knowledge about the operations of the NPRC to testify that it routinely maintained medical records of military personnel."[4] The defendants also contend that the jury "may simply have disbelieved Denius when he testified that he obtained his medical records from the NPRC [in 2001]. The jury was free to do so."

In response Denius maintains that his testimony "at a minimum . . . demonstrated that [the] NPRC maintains medical records and created a rebuttable presumption [that] the NPRC had custody of his medical records in 1996, or might reasonably obtain custody during the life of the [First Authorization], which presumption [defendants] failed to rebut." And, Denius argues, because his testimony was uncontradicted and unimpeached, the jury was required to take it as true. Denius also offers a number of alternative bases on which he says we can affirm the district court's judgment.

We find one of these alternative bases persuasive—that the district court abused its discretion in withdrawing its judicial notice of the information from NPRC's official web-

---

[3] This is the only ground on which the defendants challenge the court's grant of JMOL to Denius.

[4] Denius tried to call Ronald Hindman, Director of the NPRC, to establish this point, but the district court barred Hindman from testifying because Denius did not identify him during pretrial discovery.

site, *see Waid v. Merrill Area Pub. Sch.*, 130 F.3d 1268, 1272 (7th Cir. 1997)—and therefore see no need to address the parties' remaining arguments. Federal Rule of Evidence 201 provides that, when requested by a party, a court "shall" take judicial notice of a fact that is "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b), (d). We cannot agree with the court's determination that judicial notice was unnecessary given Denius's own testimony regarding his records. The information on the website was not duplicative of the testimony; rather, it would have provided essential corroboration. Further, the fact that the NPRC maintains medical records of military personnel is appropriate for judicial notice because it is not subject to reasonable dispute. As the agency's website explains,

> The National Personnel Records Center, Military Personnel Records (NPRC-MPR) is the repository of millions of military personnel, health, and medical records of discharged and deceased veterans of all services during the 20th century. NPRC (MPR) also stores medical treatment records of retirees from all services, as well as records for dependent and other persons treated at naval medical facilities. Information from the records is made available upon written request (with signature and date) to the extent allowed by law.

http://www.archives.gov/facilities/mo/st_louis/military _personnel_records.html; *see Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002) (taking judicial notice of information from official website of the FDIC); *see also United States v. Chapel*, 41 F.3d 1338, 1342 (9th Cir. 1994) (district court properly took judicial notice of FDIC-insurance status; the FDIC, "the insuring agency itself, is a source whose accuracy cannot be reasonably questioned") (quotations omitted). Moreover, a Westlaw search of the Federal Register uncovered numer-

ous Notices disclosing the same information. *E.g.,* 67 Fed. Reg. 69765, 69765 (Nov. 19, 2002) ("[T]he National Personnel Records Center (NPRC) of the National Archives and Records Administration (NARA) administers military personnel and medical records of veterans after discharge, retirement, and death."); 67 Fed. Reg. 55277, 55278 (Aug. 28, 2002) ("In accordance with rules issued by the Department of Defense (DOD) and the Department of Transportation (DOT), the NPRC . . . administers military service records of veterans after discharge, retirement, and death, and the medical records of these veterans, current members of the Armed Forces, and dependents of Armed Forces personnel."); 58 Fed. Reg. 10002, 10463 (Feb. 22, 1993) ("On separation/retirement the [health] records [of a U.S. military member] are forwarded to [the] National Personnel Records Center (NPRC/MPR) or other designated depository . . . such as . . . to [the] appropriate Veterans Administration Regional Office, if VA claim has been filed.").

Judicial notice may be taken at any time, including on appeal. Fed. R. Evid. 201(f); *United States v. Burch*, 169 F.3d 666, 671 (10th Cir. 1999); *Green v. Warden, U.S. Penitentiary*, 699 F.3d 364, 369 (7th Cir. 1983). We exercise that authority here to note that the NPRC and the VA do in fact maintain medical records of retired United States military personnel. *See also* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed . . . ."); *City of Charleston v. A Fisherman's Best, Inc.*, 310 F.3d 155, 172 (4th Cir. 2002) (appeals court can take judicial notice of proposed rule published in Federal Register even if the proposed rule was not called to the attention of the trial court); *Poindexter v. United States*, 777 F.2d 231, 236 (5th Cir. 1985) (appeals court is required to take judicial notice of information contained in agency regulations). The defendants have simply caused additional judicial work by contesting a factual issue that, according to information readily available in the public domain, cannot be reasonably

disputed. The district court was therefore right to grant JMOL for Denius.[5]

## B. Defendants' Motion for JMOL

The defendants also maintain that the case should never have gone to the jury in the first place because the district court should have granted their motion for JMOL at the close of evidence. They give two reasons in support of this argument. First, they assert that Denius failed to establish an essential element of his claim—that the constitutional violation in question caused his injuries. *See Papapetropoulous v. Milwaukee Transp. Serv., Inc.*, 795 F.2d 591, 595 (7th Cir. 1986). According to the defendants, in order to prove causation, Denius had to show that he did not sign the First Authorization specifically because he did not want to authorize the release of his medical records. Defendants then argue that Denius did not meet this burden because he provided no evidence that he was concerned with medical records in particular when he refused to sign; rather, Denius's testimony was simply that he found the First Authorization objectionable because it was "an invasion of privacy" and "too personal."

Denius counters that the defendants are "turn[ing] causation on its head." He believes that his state of mind is completely irrelevant to the causation inquiry, so he did not have to establish that the "medical records" aspect of the First Authorization had any bearing on his decision not to sign. Instead, according to Denius, all he had to prove was that the defendants' conduct (conditioning employment on his signing the release form) caused his injury (loss of his job). We disagree with this formulation. If the evidence had shown that Denius's refusal to sign was motivated solely

---

[5] Because JMOL was proper, we need not address the district court's alternative holding that Denius is entitled to a new trial.

by, say, personal animosity towards Dunlap, there would be no causal link between the constitutional violation and Denius's dismissal. Or suppose the evidence showed that Denius's only concern about the form was that it required disclosure of attorney-client communications (a claim on which defendants are entitled to qualified immunity, *see Denius I*, 209 F.3d at 955). Again in this situation, Denius would not have proved that the defendants' intrusion into the confidentiality of his medical records was the cause of his injury.

Nonetheless, even under defendant's formulation, which is the correct one, Denius offered enough evidence on causation to justify sending the case to the jury. Denius testified at trial that he did not sign the First Authorization because it was "an invasion of privacy," "too personal," "not necessary," and "unconstitutional." The defendants allege that this testimony was "too vague" to prove causation since "there are many aspects to the right of privacy, and they are not interchangeable." But on a motion for JMOL, it was the defendants' burden to show that no reasonable jury could have found for Denius when reviewing the evidence in a light most favorable to him. *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857 (7th Cir. 2001). Defendants did not meet this burden. A reasonable jury could have easily inferred from Denius's testimony that the "medical records" aspect of the release form was at least partly what motivated his decision not to sign. Moreover, Denius also testified that he "was concerned with everything on the release with the exception of the . . . criminal background check and the education records" and that "as a retired military person, [he] knew that [his] records were at the National Personnel Records Center." This testimony alone was sufficient to preclude granting JMOL.

The defendants also claim that the district court should have granted Dunlap qualified immunity because a reasonable official in his position would not have known that the First Authorization extended to medical records. As an initial matter, we note that even if Dunlap is entitled to

qualified immunity, it would not provide a complete defense because Denius asked for injunctive and declaratory relief in addition to money damages. *Canedy v. Boardman*, 91 F.3d 30, 33 (7th Cir. 1996). And in any event, qualified immunity does not apply. The defense does not protect "the plainly incompetent or those who knowingly violate the law." *Thompson v. Wagner*, 319 F.3d 931, 935 (7th Cir. 2003) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)) (quotations omitted). Dunlap asserts that a reasonable official in his position would not have known that the NPRC maintained medical records, nor would a reasonable official "necessarily have investigated every possible legal effect of the Authorization." We disagree. First of all, Dunlap was the drafter of the Authorization, so we assume that he knew (or at least should have known) what all of its terms meant. Furthermore, we believe that a reasonable official in Dunlap's position would, at a minimum, have made *some* effort to look into the form's legal effect. With just minimal investigation, Dunlap could likely have discovered that veterans' medical records are housed at the NPRC, but he chose not to conduct such a search. This was plainly unreasonable, so the district court was correct to deny Dunlap's defense of qualified immunity.

### C.  Injunctive Relief

The defendants' last argument on appeal is that the district court erred in granting Denius's request for injunctive relief. We review the court's decision for abuse of discretion, analyzing conclusions of law *de novo* and factual determinations for clear error. *Minnesota Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 597 (7th Cir. 2001).

The defendants claim that the Eleventh Amendment bars injunctive relief because Denius did not prove the existence of an ongoing or threatened violation. *See Vickery v. Jones*, 100 F.3d 1334, 1346 (7th Cir. 1996). The district court found otherwise, however, concluding that there was a "real danger" that the defendants would violate Denius's consti-

tutional rights again in the future. The court gave two reasons for its finding. First, it believed that the defendants' conduct throughout the course of this litigation "consistently demonstrated a failure to appreciate the wrong committed." The court specifically pointed to defense counsel's closing argument, which the court believed "malign[ed] the plaintiff's integrity," "castigated" him, and suggested that he should not recover "because his hands were unclean." But whether or not this is true, we are uncertain how relevant defense counsel's conduct during closing argument is to the question of how the defendants *themselves* are likely to act in the future. Statements made during closing argument are, of course, not evidence. *Rastafari v. Anderson*, 278 F.3d 673, 690 (7th Cir. 2002).

Nonetheless, the district court's other reason for granting injunctive relief was sound. The jury returned a special verdict finding that the defendants were "likely in the future to require [Denius] to sign Authorizations for Release of Personal Information similar to [the First and Second Authorizations] as a condition of employment." The court rightly held that it was bound by this determination. *Snider v. Consolidation Coal Co.*, 973 F.2d 555, 559 (7th Cir. 1992). True, as the defendants point out, the evidence supporting the jury's finding was somewhat sparse. It was not wholly lacking, however. For instance Thomas testified on cross-examination that all of the signed First and Second Authorizations, other than Denius's, remained in the LCP personnel files. Thomas further testified that, other than Denius, LCP employees were never told that they could retract their Authorizations, nor were they informed that the form had been revised to cover only criminal records. Though this testimony did not speak to Denius's situation directly, we conclude that it was enough evidence, under the highly deferential standard of review applicable to jury findings, *Reynolds v. City of Chicago*, 296 F.3d 524, 526-27 (7th Cir. 2002), from which a reasonable jury could infer the existence of a threatened constitutional violation.

The defendants also maintain that the district court abused its discretion by failing to properly weigh the traditional criteria used to determine the propriety of equitable relief—namely (1) whether the plaintiff has succeeded on the merits, (2) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction is not granted, (3) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant, and (4) whether the injunction will harm the public interest. *Plummer v. Am. Inst. of Certified Pub. Accountants*, 97 F.3d 220, 229 (7th Cir. 1996). We find no abuse of discretion. The district court properly weighed the four factors and found that they justified the grant of relief. Notably, the defendants conceded at oral argument that they will suffer no harm whatsoever from the issuance of the injunction.[6]

### D. Damages

In his cross-appeal, Denius maintains that the district court erred by granting the defendants' motion for JMOL on the issue of emotional damages. We review this issue *de novo. Bruso*, 239 F.3d at 857.

The only direct evidence that Denius suffered any emotional distress was his own testimony that signing the First Authorization "would have negated everything I stood for," that being out of work at age sixty "concerned" and "troubled" him, and that he was "embarrassed and humiliated" by the circumstances in which he was fired. But when the injured party's own testimony is the only proof of emotional damages, he must explain the circumstances of his injury in reasonable detail; he cannot rely on mere conclusory statements. *Biggs v. Village of Dupo*, 892 F.2d 1298, 1304

---

[6] Because we conclude that the injunction was proper, we need not address Denius's alternative argument that he is at least entitled to declaratory relief.

(7th Cir. 1990). Thus, we have said that bare allegations by a plaintiff that the defendant's conduct made him "depressed," "humiliated," or the like are not sufficient to establish injury unless the facts underlying the case are so inherently degrading that it would be reasonable to infer that a person would suffer emotional distress from the defendant's action. *Alston v. King*, 231 F.3d 383, 388 (7th Cir. 2000); *United States v. Balistrieri*, 981 F.2d 916, 931-32 (7th Cir. 1992).

Here, the circumstances surrounding Denius's dismissal were not so inherently humiliating. Denius relies heavily on the fact that Dunlap called security personnel to escort him out of the building, but Denius admitted during trial that Dunlap was nonetheless courteous and gave him the time to put things away, straighten his desk, and collect his belongings. Further, Denius presented no evidence that the security personnel touched or mistreated him in any way. There was, in short, no evidence to suggest any type of "inherently degrading conduct that would portend emotional distress," *Alston*, 231 F.3d at 388, and so Denius's bare allegations that he was "embarrassed" and "humiliated" were insufficient to justify sending the issue to the jury. The court properly granted JMOL for the defendants. *Cf. id.* at 389 (district court erred in granting JMOL on issue of emotional damages, where plaintiff testified that his co-workers mocked and laughed at him after defendant terminated his job without a hearing).

## E. Attorneys' Fees

Denius also cross-appeals from the district court's order awarding attorneys' fees, claiming that the court erred in setting the hourly rate for associate counsel J. Brian Heller at $180 instead of $200. We review the court's decision for abuse of discretion. *Mathur v. Bd. of Tr. of S. Ill. Univ.*, 317 F.3d 738, 742 (7th Cir. 2003).

When calculating attorneys' fees, the reasonable hourly rate is to be derived from the market rate for the services rendered. *Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399, 407 (7th Cir. 1999). The attorney's actual billing rate for comparable work is "presumptively appropriate" to use as the market rate. *Id.* To this end Denius submitted an affidavit from Heller that claimed an hourly rate of $200 in the year 2001. Denius also submitted an affidavit from civil rights attorney Patricia Benassi stating that $200 was more than a reasonable rate for an attorney of Heller's experience and ability.

The district court expressed "concern" about the sufficiency of these affidavits, however. The court noted that "there is nothing in the record to show that Mr. Heller . . . has earned that [$200] hourly rate in other civil rights litigation. The court needs more information before it can determine Mr. Heller's market rate. . . . The court needs to know at what hourly rate Mr. Heller has been compensated in the past in other civil rights matters." Denius then submitted a supplemental affidavit from Heller, in which Heller stated that 80-90% of his civil rights practice was performed for and billed through the law firm of Benassi & Benassi, P.C., and that the most recent civil rights litigation he undertook on his own occurred in January 2001 and was billed at a rate of $180 per hour. Heller explained that "the standard rate used in that case is $180.00/hour rather than $200/hour since the litigation is not in federal court, and is not contingent in nature." Denius also submitted a supplemental affidavit from Patricia Benassi stating that, prior to 1995 and through 1999, Benassi & Benassi billed out Heller's services at a rate of $150 per hour and that the "current" rate for Heller's services was $200 per hour.

Defendants argued that these supplemental affidavits failed to establish that Heller was entitled to a $200 rate, and the district court agreed, determining that $150 was the appropriate hourly fee for services rendered before 1999 and $180 for those rendered thereafter. On appeal Denius

quarrels only with this latter determination. Specifically, he claims that the court should have used the $200 figure for services performed after 1999 because the record showed that 80-90% of Heller's civil rights work was being billed at that rate through Benassi & Benassi. We disagree with Denius's position. First, Patricia Benassi's affidavit spoke only to the "current" rate at which her firm was billing Heller's services; it said nothing about his rate from 2000 to mid-2001 (when the affidavit was filed). And second, the *only* evidence regarding Heller's rate when billing under his own name (as he is doing here) was his own statement that he charged $180 per hour for the civil rights case he litigated in January 2001. The district court was therefore well within its discretion in setting this figure as Heller's market rate.

Finally, Denius argues that the district court should have awarded interest for the delay in payment of his attorneys' fees. He did not raise this issue below, however, so it is waived. *Williams v. REP Corp.*, 302 F.3d 660, 666 (7th Cir. 2002).

### III. CONCLUSION

For the reasons stated above, the judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*