Nicholas R. CIPRIANI, Plaintiff,

v.

LYCOMING COUNTY HOUSING AU-THORITY; Janice Pepperman, Indi-vidually and as Community Counsel of the Lycoming County Housing Au-thority; and Elizabeth Montgomery, Individually and as Deputy Executive Director of the Lycoming County Housing Authority, Defendants.

No. 4:CV–99–980.

United States District Court, M.D. Pennsylvania.

Dec. 14, 2001.

Katherine M. Allen, Janine C. Gismondi, McQuaide, Blasko, Schwartz, Fleming & Faulkner, Inc., State College, KS, for plaintiff.

Joseph F. Orso, III, John R. Bonner, Casale & Bonner, P.C., Williamsport, KS, for defendants.

## MEMORANDUM

McCLURE, District Judge.

### BACKGROUND:

On June 14, 1999, plaintiff Nicholas R. Cipriani filed a complaint against defendants pursuant to 42 U.S.C. §§ 1983 and 1985, the Pennsylvania Whistleblower Law, 43 Pa. Stat. Ann. §§ 1421 et seq., the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 et seq., the Pennsylvania Human Relations Act (PHRA), 43 Pa. Stat. Ann. §§ 951 et seq., the Pennsylvania Civil Service Act, 71 Pa. Stat. Ann. §§ 741.1 et seq., and the Comprehensive Omnibus Budget Reconciliation Act of 1985 (COBRA), P.L. 99–272, Title X. Cipriani also set forth a supplemental claim for defamation under state common law.

On September 22, 2000, the court granted, in part, defendants' summary judgment motion with respect to Counts II and V of plaintiff's complaint involving the substantive due process claim and claims under the Pennsylvania Civil Service Act. An Amended Complaint was filed by plaintiff November 7, 2000, limited to six counts. (Although restated as Count IV in the Amended Complaint, the court understands that plaintiff withdrew his Civil Service Act claim).

Counts I (First Amendment) and V (defamation) of the Amended Complaint were tried before a jury beginning December 5, 2000. On December 15, 2000, at the close of plaintiff's case, defendants made an oral motion for judgment as a matter of law based on FED. R. CIV. P. 50(a). The court denied the motion.

On December 18, 2000, the jury returned a verdict for the plaintiff and against all three defendants as to Count I, and against defendant Pepperman only as to Count V. The jury awarded plaintiff $875,000.00 in damages with respect to Count I, and $25,000.00 in damages with respect to Count V.

Counts II (procedural due process), III (Whistleblower Law) and VI (COBRA) were decided by the court. By order dated February 1, 2001, the court ruled in favor of plaintiff and against defendants as to Count II, with no damage award. The court also ruled in favor of plaintiff and against defendant Lycoming County Housing Authority ("Housing Authority") as to Count VI, with no damage award, and in favor of defendants as to Count III.

On February 12, 2001, defendants moved for judgment as a matter of law pursuant to FED. R. CIV. P. 50(b), or in the alternative, for a new trial pursuant to FED. R. CIV. P. 59(a).[1]

On May 31, 2001, plaintiff moved for entry of judgment. The court granted plaintiff's motion, and on June 22, 2001, entered judgment consistent with the jury verdict and rulings of the court.

On June 29, 2001, plaintiff moved for reconsideration of the court's holding in favor of defendants on plaintiff's claim under Pennsylvania's Whistleblower Law.

Now before the court are both defendants' motion pursuant to FED. R. CIV. P. 50 and plaintiff's motion for reconsideration, as well as all supporting and opposing briefs.

For the reasons set forth below, defendants' motion will be granted in part and denied in part, and plaintiff's motion will be denied.

## DISCUSSION:

### I. STANDARDS OF REVIEW

#### A. Motion For Judgment As A Matter Of Law

 The court may grant a motion for judgment as a matter of law against a party when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." FED. R. CIV. P. 50(a). The standard for considering defendants' motion for judgment as a matter of law was set forth by the Third Circuit in *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993):

Such a motion should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability. In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version. Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability. The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party.

*Id.* (internal citations and quotations omitted). *See also Failla v. City of Passaic*, 146 F.3d 149, 153 (3d Cir.1998); *McDaniels v. Flick*, 59 F.3d 446, 453 (3d Cir.1995).

#### B. Motion For A New Trial

 FED. R. CIV. P. 59(a) provides that "[a] new trial may be granted to all or any of the parties and on all or part of the issues [ ] in an action in which there has been a trial by jury …." "Under this rule, a court, in the exercise of discretion, may grant a new trial if, inter alia, the jury's verdict was against the weight of the evidence, or if substantial errors occurred in the admission or exclusion of evidence or in the charge to the jury." *Kidd v. Commonwealth of Pennsylvania, Bureau of Liquor Control Enforcement*, No. Civ.A. 97–CV–5577, 2001 WL 1159770, at *1 (E.D.Pa. Aug.21, 2001)(citing *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 61

---

1. Defendants' brief in support of their motion for judgment as a matter of law was not filed until July 23, 2001, pursuant to an order of the court dated March 14, 2001, granting defendants' request to stay briefing until disposition of plaintiff's petition for attorney's fees. By order dated June 22, 2001, the stay on briefing for defendants' motion was lifted.

S.Ct. 189, 85 L.Ed. 147 (1940)). "Nevertheless, new trials because the verdict is against the weight of the evidence are proper *only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record cries out to be overturned or shocks our conscience." Williamson v. Consolidated Rail Corp.,* 926 F.2d 1344, 1353 (3d Cir.1991) (emphasis added)(citing *EEOC v. Delaware Dep't of Health and Soc. Servs.,* 865 F.2d 1408, 1413 (3d Cir.1989)). *See also Klein v. Hollings,* 992 F.2d 1285, 1290 (3d Cir.1993).

■ Generally, a court will sustain a jury verdict "if, drawing all reasonable inferences in favor of the prevailing party, there is a reasonable basis to uphold the verdict; courts will examine the record for evidence that could reasonably have led to the jury's verdict." *Kidd,* 2001 WL 1159770, at *1 (citing *Nissim v. McNeil Consumer Products Co.,* 957 F.Supp. 600, 602–04 (E.D.Pa.1997), *aff'd, without opinion,* 135 F.3d 765 (3d Cir.1997)). *See also Motter v. Everest & Jennings, Inc.,* 883 F.2d 1223, 1230 (3d Cir.1989). Indeed, "[a] trial judge must be extremely reluctant to interfere with the time-honored power of the jury, in the exercise of its collective judgment, to assess the damages sustained by the plaintiff." *Wontor v. Neenan,* No. 92–1588, slip op. at 7 (M.D.Pa. June 28, 1996). (internal quotation and citations omitted). Moreover,

> [t]he court does not have the prerogative 'to substitute its own judgment as to the amount of damages for that of the jury. Thus, regardless of whether the trial judge agrees or disagrees with the jury's verdict, the verdict must be upheld so long as it is supported by a 'minimum quantity of evidence from

which a jury might reasonably [decline to] afford relief.'

*Id.* at 7–8 (quoting *New Market Inv. Corp. v. Fireman's Fund Ins. Co.,* 774 F.Supp. 909, 917 (E.D.Pa.1991))(further citation omitted).

■ "A party moving for a new trial on the basis of an improper jury instruction must have made an appropriate and timely objection prior to the start of jury deliberations." *Kidd,* 2001 WL 1159770, at *2 (citing *Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., Inc.,* 74 F.3d 488, 496 (4th Cir.1996); *Juneau Square Corp. v. First Wis. Nat'l Bank,* 624 F.2d 798, 810 (7th Cir.1980)).

## II. STATEMENT OF RELEVANT FACTS

Only facts relevant to the motions now before the court are recited herein.[2] The evidence is viewed in a light most favorable to plaintiff, as the nonmovant.

In 1994, plaintiff became the Director of the Operations Department at the Housing Authority, a job in which he supervised approximately ten employees.

Prior to November 1998, plaintiff's immediate supervisor had been Janice Pepperman (Pepperman), the Executive Director of the Housing Authority. Sometime in November of 1998, Pepperman announced that she was resigning her position as Executive Director to take a newly created position of Community Counsel for the Housing Authority. Shortly thereafter, Elizabeth Montgomery (Montgomery) was promoted from her position as Deputy Executive Director to Executive Director of the Housing Authority.

---

**2.** A more extensive recitation of facts in this case is provided in our memorandum dated February 1, 2001.

Throughout the course of his employment, plaintiff had raised several complaints concerning Montgomery, who had begun employment at the Housing Authority in 1995. The two complaints at issue involve (1) Montgomery's failure to disclose her relationship to Dean Severson (Severson), her brother-in-law, prior to his being hired for a position in the Operations Department; and (2) Montgomery's solicitation of $250.00 from Turnkey Construction, Inc. ("Turnkey Construction") for her son's hockey team.

In the spring of 1996, plaintiff was in the process of interviewing applicants for an opening in the Operations Department. Although Montgomery was aware that Severson applied for the position, she did not inform plaintiff that Severson was her brother-in-law. After plaintiff offered the job to Severson and he accepted, Montgomery told plaintiff of her relationship to Severson. After Severson was hired, but before his start date at the Housing Au-

thority, plaintiff complained to Montgomery and Pepperman that the employment of Severson violated the Housing Authority's personnel policy and created a potential conflict of interest. Pepperman agreed with the hiring of Severson, and did not view Severson's employment with the Housing Authority as precluded under its personnel policy.[3]

Sometime in the spring of 1998, Montgomery was promoted to Deputy Executive Director. Even though Montgomery would eventually become the Executive Director and be in a position to influence the employment status and salary of employees in the Operations Department, Pepperman again told plaintiff that there was no violation of the personnel policy in hiring Severson. Plaintiff again raised his concerns about the conflict of interest involved in the employment of Severson in November of 1998, at the time he learned of Montgomery's promotion to Executive Director.

**3.** Relevant portions of the Housing Authority's Personnel Policy include Sections 2 and 6, entitled "Hiring Procedures and Criteria" and "Conflicts of Interest," respectively:

Section 2 states, in pertinent part, that "[t]he employment of more than one member of the same immediate family shall be avoided as much as possible, except where that may be in violation of the ruled of the Pa. Civil Service Commission."

Section 6 provides, in relevant part, the following:
Employees have an obligation to conduct business within guidelines that prohibit actual or potential conflicts of interest. This policy establishes only the framework within which [the Housing Authority of the County of Lycoming] [(HACL)] wishes the business to operate . . . .
Transactions with outside firms must be conducted within a framework established and controlled by the executive level of HACL. Business dealings with outside firms should not result in unusual gains for those firms . . . .
An actual or potential conflict of interest occurs when an employee is in a position

to influence a decision that may result in a personal gain for that employee or for a relative as a result of HACL's business dealings. For the purposes of this policy, a relative is any person who is related by blood or marriage, or whose relationship with the employee is similar to that of persons who are related by blood or marriage.
No "presumption of guilt" is created by the mere existence of a relationship with outside firms. However, if an employee has any influence on transactions involving purchases, contracts, or leases, it is imperative that he or she disclose to an officer of HACL as soon as possible the existence of any actual or potential conflict of interest so that safeguards can be established to protect all parties.
Personal gain may result not only in cases where an employee or relative has a significant ownership in a firm with which HACL does business but also when an employee or relative receives any kickback, bribe, substantial gift, or special consideration as a result of any transaction or business dealings involving HACL.

In the fall of 1997, Plaintiff overheard a telephone conversation in which Montgomery solicited $250.00 from Turnkey Construction for her son's hockey team. Montgomery also wrote a letter to Turnkey Construction soliciting funds for her son's hockey team in which she stated: "While we welcome and appreciate any donation, organizations donating $250.00 or more will have their name placed on team jerseys." On August 22, 1997, Turnkey Construction contributed $250.00 to Montgomery's son's hockey team. At that time, Turnkey Construction was a contractor with the Housing Authority and Montgomery held the position of "Comp Grant Coordinator" in which she was responsible for authorizing payments to Housing Authority contractors. Notably, Montgomery was not in a position to influence the contract with Turnkey Construction, as contracts with the Housing Authority are awarded by sealed bids and the Turnkey Construction contract was previously secured by the Housing Authority Board of Directors.

At or around the time plaintiff became aware of Montgomery's solicitation, he complained to Pepperman that the solicitation violated the Housing Authority's Personnel Policy and created a conflict of interest.[4] As with his complaints about the hiring of Severson, plaintiff next raised the issue of Montgomery's solicitation in November of 1998, at the time he learned of Montgomery's promotion to Deputy Executive Director.

Other issues at the Housing Authority, unrelated to his complaints about Montgomery, concerned plaintiff. Specifically, according to plaintiff, he was advised by Pepperman that he and other Operations Department employees were to be placed on probationary status beginning in 1999 due to the Housing Authority's general restructuring process. As a result, plaintiff held two meetings with employees of the Operations Department on December 10, 1998 and December 17, 1998 to discuss concerns employees had raised regarding their job security, the Authority's personnel practices, Pepperman's new position, and other work related matters. These meetings were held at 7:30 a.m., prior to normal working hours. An employee named Ted Miller scheduled an after-work meeting with an attorney on December 17, 1998 to discuss the employees' legal rights and options. Plaintiff made clear to Operations Department employees that both the employee meetings and the meeting with the attorney were voluntary.

On the evening of December 16, 1998, Severson called Montgomery and told her about the attorney meeting scheduled for the next day. Severson also told Montgomery that at the December 10, 1998 meeting, plaintiff had encouraged the Operations Department to engage in a walkout.

In the early afternoon of December 17, 1998, Montgomery and Pepperman held a meeting with the plaintiff in which they questioned him about the two employee meetings and the planned meeting with an attorney. Plaintiff advised Montgomery that the meeting with an attorney was scheduled, and that he intended to attend. Immediately thereafter, plaintiff was placed on administrative leave.

Following his suspension on December 17, 1998, there was no further direct contact between plaintiff and defendants. On December 23, 1998, counsel for plaintiff, Janine Gismondi (Gismondi), and the solicitor for the Housing Authority, John Bonner (Bonner), engaged in a telephone conference. This telephone conference was

---

**4.** See footnote 3, discussing Section 6 of the Housing Authority's Personnel Policy.

the first conversation between counsel. At the outset of this conversation, Bonner informed Gismondi that the decision to terminate plaintiff's employment had been made. During the course of the conversation, Bonner mentioned several reasons for plaintiff's discharge; however, the focus of the December 23, 1998 conversation, as well as a second conversation between counsel on December 31, 1998, was on possible settlement terms. Bonner advised Gismondi of approximately four reasons for plaintiff's discharge, and at no time provided plaintiff any opportunity to respond to the charges against him.

Subsequently, on January 12, 1999, plaintiff received a letter advising him of the Housing Authority's decision to terminate his employment, effective January 14, 1999. The letter listed eleven separate reasons for his discharge.

Additional facts will be discussed in the context of the claims to which they relate.

### III. DEFENDANTS' MOTION FOR JUDGMENT N.O.V.

Defendants move for post-trial relief on numerous grounds, including the following: (1) that plaintiff did not exhaust his administrative remedies pertaining to his procedural due process claim; (2) that plaintiff did not state a claim for a procedural due process violation; (3) that plaintiff's complaints regarding Montgomery's solicitation from TurnKey Construction and defendants' employment of Dean Severson were not protected speech under the First Amendment, and that plaintiff's intent to meet with an attorney was similarly not protected under the First Amendment; (4) that the court erred when it refused to allow defendants to present a "good faith"

defense to plaintiff's First Amendment claim; (5) that the court erred when it excluded evidence of conversations between counsel for the parties between December 17, 1998 and January 12, 1999; (6) that since the court held that Pepperman and Montgomery were not policymakers, the Housing Authority is entitled to judgment as a matter of law; (7) that, in the alternative, the individual defendants are entitled to qualified immunity; and (8) that the court improperly charged the jury on plaintiff's claim for future lost earnings.[5] In their reply brief in support of their motion, defendants argue for the first time that if the court determines that certain First Amendment issues should not have been submitted to the jury, they are entitled to a new trial based on the special verdict form.

Plaintiff, on the other hand, argues that defendants waived all issues not specified in their Rule 50(a) motion at trial, and further challenges each of the aforementioned arguments presented by defendants.

We address each argument, in turn, below.

#### 1. Waiver Of Issues Not Raised In Defendants' Rule 50(a) Motion

Plaintiff contends that defendants' failure to raise at trial two arguments raised in the present post-trial motion constitutes a waiver of the arguments. Specifically, plaintiff submits that defendants have waived any objection with regard to plaintiff's ability to recover front pay through age 65, as well as their argument that the actions of Montgomery and Pepperman cannot render the Housing Authority lia-

---

**5.** Defendants move for judgment as a matter of law on plaintiff's First Amendment claims, procedural due process claim, and defamation claim as against Pepperman. In the al-

ternative, defendants request that we grant a new trial on these claims. Defendants' Brief at 25.

ble for a § 1983 violation given the United States Supreme Court's ruling in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)(holding that a municipality may be liable under § 1983 if the execution of one of its customs or policies deprives the plaintiff of one or more of his constitutional rights; however, a municipality cannot be liable under § 1983 merely upon a theory of *respondeat superior* ).

■ "FED. R. CIV. P. 50(a)(2) requires that a motion for a judgment as a matter of law 'shall specify the judgment sought and the law and facts on which the moving party is entitled to judgment.' " *Williams v. Runyon,* 130 F.3d 568, 571 (3d Cir.1997). A post-trial motion for judgment as a matter of law under FED. R. CIV. P. 50(b), such as defendants' instant motion, "must be preceded by a Rule 50(a) motion *sufficiently specific* to afford the party against whom the motion is directed with an opportunity to cure possible defects in proof which otherwise might make [his] case legally insufficient." *Lightning Lube,* 4 F.3d at 1173 (citing *Acosta v. Honda Motor Co.,* 717 F.2d 828, 831–32 (3d Cir. 1983)). "Under normal circumstances, a defendant's failure to raise an issue in a Rule 50(a)(2) motion with sufficient specificity to put the plaintiff[ ] on notice waives the defendant's right to raise the issue in their Rule 50(b) motion." *Williams,* 130 F.3d at 571–72. *See also Perdoni Bros., Inc. v. Concrete Sys., Inc.,* 35 F.3d 1, 3 (1st Cir.1994) ("The law is crystal clear that a

party may not base its motion for a judgment n.o.v. on a ground that was not argued in its motion for directed verdict.").

In this case, it is clear that defendants waived several issues on which their post-trial motion is based.

Defendants, in their brief in support of their instant motion, submit that plaintiff never presented any evidence that he intended to work until the age of 65 and, thus, the court improperly charged the jury on plaintiff's claim for future lost earnings.[6] In addition, defendants, citing *Monell,* contend that since the court concluded that the individual defendants were not policymakers, their actions could not bind the Housing Authority for any violations of a constitutional right under 42 U.S.C. § 1983 and, therefore, the Housing Authority is entitled to judgment as a matter of law on plaintiff's First Amendment and due process claims. Nowhere in their Rule 50(a) motion did defendants raise either issue.[7]

Indeed, a review of the trial transcripts reveals that defendants, in their oral Rule 50(a) motion, argued that they were entitled to judgment as a matter of law on several issues, including (1) that there was insufficient evidence on many grounds to support any First Amendment claim; (2) that Montgomery and Pepperman were entitled to qualified immunity from any alleged First Amendment violation; (3) that there was insufficient evidence to support a defamation claim; (4) that Mont-

---

**6.** To the court's knowledge, the portion of the jury charge to which defendants refer includes the following:

"You should consider the following elements of damage, to the extent you find them proved by a preponderance of the evidence, and no others:
 (a) Net lost wages and benefits to the date of trial;
 (b) Future lost earnings and benefits;
 (c) Emotional pain and mental anguish."

Final Jury Instructions at 13.

**7.** Although not raised in their Rule 50(a) motion, we point out that during the court's review of the verdict slip, defendants objected "to the submission to the jury any issue as to loss of earning capacity because ... any award in that regard would be speculative." December 15, 2001, N.T. 26 (morning session).

gomery and Pepperman, as "policymakers" are entitled to absolute immunity under Pennsylvania law for any claim of defamation; and (5) that there was insufficient evidence of a report of a "wrongdoing" under the Pennsylvania Whistleblower Act to support plaintiff's Whistleblower claim. Defendants deferred their arguments regarding plaintiff's due process and COBRA claims, as they were both tried non-jury.[8]

■ Defendants argue that they did not challenge plaintiff's ability to recover front pay in their prior Rule 50(a) motion because "it was not made known that Cipriani intended to recover front pay through age 65 until the time that counsel argued the figure to the jury." Defendant's [sic] Reply Brief in Support of the Defendant's [sic] Motion for Post–Trial Relief ("Defendants' Reply")(record doc. no. 163) at 2.

Plaintiff points out, however, that in his trial brief he had indicated that he planned to seek front pay until the age of 65. Specifically, in his trial brief, plaintiff stated:

> In addition to back pay, a successful claimant asserting [a] violation of First Amendment rights is also entitled to front pay or future lost earnings where reinstatement is not feasible. *Feldman v. Philadelphia Housing Authority*, 43 F.3d 823, 831–32 (3d Cir.1994). The purpose of front pay or future damages is to make the plaintiff whole for future expected losses. *Id.* at 832. A jury may calculate an award of front pay based on the expected future damages caused by the constitutional violation from the date of judgment to the antici-

pated date of retirement by the plaintiff, less any wages and benefits the plaintiff might have received during the period of time. *Id.*

Plaintiff's Trial Brief (record doc. no. 77, filed December 5, 2000) at 13.

Additionally, in his points for charge, plaintiff noted that the jury could calculate damages on the First Amendment claim to include front pay until the anticipated date of plaintiff's retirement. *See* Plaintiff's Proposed Points For Charge (record doc. no. 79, filed December 5, 2000) at 15.

It is clear that defendants had notice prior to closing arguments that plaintiff intended to seek front pay damages to the age of 65, his anticipated date of retirement. Defendants failed to raise this issue in a proper Rule 50(a) motion and, thus, cannot now challenge the sufficiency of plaintiff's evidence in support of his claim for damages on the First Amendment claim. Therefore, defendants' claim that the court improperly charged the jury on plaintiff's ability to recover front pay is waived for purposes of its Rule 50(b) motion.[9]

With respect to defendants' claim under *Monell*, they argue that "this [c]ourt has the authority to consider the *Monell* argument based upon the 'plain error' doctrine." Defendants' Reply at 2 (citing Comments to FED. R. CIV. P. 51).

The court finds this argument to be confusing. Notably, the court is unable to locate the "Comment to FED. R. CIV. P. 51" to which defendants cite. Furthermore, Rule 51 deals with a party's responsibility to state distinctly the nature of its objec-

8. Plaintiff's Whistleblower claim was also decided by the court; however, at the time of defendants' Rule 50(a) motion, defendants were under the impression that the claim would be heard by the jury as an advisory panel.

9. Obviously, because we find this issue waived for purposes of defendants' instant motion, we do not address whether there was sufficient evidence that plaintiff would work until the age of retirement to support the jury's damage award.

tion to a jury instruction. Defendants, to the court's knowledge; have not phrased their *Monell* argument in terms of an improper jury instruction but, rather—as previously noted—claim that, under *Monell*, the Housing Authority is entitled to judgment as a matter of law, given the court's finding that defendants Montgomery and Pepperman were not policymakers. We find defendants' Rule 51 argument on this issue to be misplaced at best and, therefore, cannot credit their assertion.

■ Defendants also contend that their *Monell* argument is not waived because "the Municipal Defendants [sic] have contended since the filing of the Answer that Cipriani's claims were barred by immunity." Defendants' Reply at 2. As noted above, however, the fact that defendants raised the issue of immunity previously is simply not enough for purposes of their instant Rule 50(b) motion with respect to their *Monell* argument, given the Third Circuit's holding in *Lightning Lube, Inc.*, 4 F.3d at 1173 (stating that Rule 50(b) motion "must be preceded by a Rule 50(a) motion *sufficiently specific* to afford the party against whom the motion is directed with an opportunity to cure possible defects in proof which otherwise might make [his] case legally insufficient.")(further citation omitted). *See also Williams*, 130 F.3d 568 (ruling that "under normal circumstances" defendant's failure to raise exhaustion issue in Rule 50(a) motion, waived the issue for his Rule 50(b) motion, despite that issue had been raised in prior

motion to dismiss or, in the alternative, for summary judgment).[10]

Accordingly, as a result of defendants' failure to raise in their Rule 50(a) motion the issues of plaintiff's ability to recover front pay and the Housing Authority's immunity under *Monell*, defendants have waived the issues for purposes of their present motion, and we will consider the arguments no further.

### 2. Defendants' Failure To Exhaust Claim

Defendants claim that they are entitled to judgment as a matter of law on plaintiff's procedural due process claim since plaintiff failed to exhaust the administrative remedies available to him under the Pennsylvania Civil Service Act. 71 Pa. Stat. Ann. § 741.950 et seq. Defendants contend specifically that:

> As a Civil Service employee, Cipriani is protected against dismissal except for just cause. Cipriani was notified of the reasons for his termination and his right to apply for a Due Process Hearing before the Pennsylvania Civil Service Commission. Cipriani chose to voluntarily abandon his Civil Service proceeding. This voluntary dismissal bars Cipriani's procedural due process claim.

Defendants' Brief at 1.

Plaintiff responds that exhaustion of state administrative remedies is not required under 42 U.S.C. § 1983. While this assertion is correct, *see Patsy v. Bd. of Regents of the State of Florida*, 457 U.S.

---

**10.** In *Williams,* the court found that plaintiff had "waived her right to contest the Rule 50(b) motion" by failing to object to the Rule 50(b) motion on the grounds that the exhaustion issue was not preserved by an adequate Rule 50(a) motion. 130 F.3d at 572. However, the court reversed the district court's entry of judgment as a matter of law in favor of defendant on exhaustion grounds, holding

that defendant's failure to offer any evidence at trial regarding plaintiff's failure to exhaust her administrative remedies, as well as his failure to raise the exhaustion issue in his motion for directed verdict, waived his right to renew the exhaustion argument in a subsequent motion for judgment n.o.v. *Id.* at 573–74.

496, 512, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), it does not in and of itself mean that a procedural due process claim brought by way of § 1983 does not need to be exhausted prior to being filed in federal court. Indeed, there is a distinction between the lack of an exhaustion requirement under § 1983 and the general requirement for procedural due process claims that aggrieved parties avail themselves of such procedural protection as is available. *See generally Alvin v. Suzuki*, 227 F.3d 107 (3d Cir.2000). Adding further to our analysis of defendants' claim is the distinction between available pre-deprivation and post-deprivation remedies.

■■■ Plaintiff claims that defendants violated his *pre-termination rights*, thus being the focus of our analysis.[11] Specifically, plaintiff's procedural due process claim is based on his asserted right to notice and an opportunity to be heard prior to his termination. Under the procedural due process test annunciated in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), a public employee such as plaintiff is entitled to notice and an opportunity to be heard prior to being deprived of his or her property interest in employment. *Alvin*, 227 F.3d at 121 (citing *McDaniels v. Flick*, 59 F.3d 446, 456 (3d Cir.1995)). Pursuant to *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), " 'the root requirement' of the Due Process Clause [is] 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant interest.' " *Id.* at 542, 105 S.Ct. 1487 (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct.

780, 28 L.Ed.2d 113 (1971)) (emphasis in original).

In *Stana v. School Dist. of the City of Pittsburgh*, the Third Circuit held that "if the governmental entity could have, but did not, provide predeprivation procedures, a § 1983 action complaining of the lack of procedural due process may be maintained in federal court, notwithstanding the availability of state judicial routes as well." 775 F.2d 122, 130 (3d cir.1985). The plaintiff in that case, a teacher, brought a § 1983 suit against the school district, alleging that the school district's failure to provide her with notice and an opportunity to be heard concerning a negative evaluation prior to its decision to bypass her for a teaching position and to remove her from the eligibility list violated the Due Process Clause of the Fourteenth Amendment. *Id.* at 125. The Third Circuit reversed the district court's finding that defendants were entitled to summary judgment on the basis that the plaintiff had failed to make out a § 1983 violation. *Id.* at 128. The district court "read *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) as holding that 'a deprivation of property does not rise to the level of a constitutional violation so long as the state provides a forum within which redress may be had.' " *Stana*, 775 F.2d at 128 (quoting district court's holding; citation omitted).

The *Stana* court distinguished its case from the case before the Court in *Parratt:*

> In *Parratt*, the Court focused on the question of 'what process is due a person when an employee of a State negligently takes his property.' 451 U.S. at 537 [101 S.Ct. 1908], . . . . The Court stated

---

11. A post-termination hearing was available to plaintiff through the Civil Service Commission, and plaintiff did not avail himself of those procedures. Therefore, pursuant to the court's memorandum dated September 22,

2000, any claim that he was denied procedural due process post-termination was barred for failure to exhaust. *See* Memorandum at 18.

that in 'a situation such as the present one involving a tortious loss of a prisoner's property as a result of a random and unauthorized act by a state employee ... it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation.' *Id.* at 541 [101 S.Ct. 1908], .... Thus, the situation was like those in '[t]he prior cases which have excused the prior-hearing requirement [and which] rested in part on the availability of some meaningful opportunity subsequent to the initial taking for a determination of rights and liabilities.' *Id.*

Here, of course, a pretermination hearing was neither impracticable nor impossible. Thus, even if Pennsylvania had a procedure that might have provided Stana some redress, an issue which the parties dispute, that does not diminish the nature of the deprivation, which was the denial of procedural due process to Stana at a meaningful time before her name was effectively removed from the list.

This conclusion is reinforced by the Court's more recent decision in *Cleveland Board of Education v. Loudermill,* [470] U.S. [532, 105 S.Ct. 1487, 84 L.Ed.2d 494] (1985). Both plaintiffs there were held to have stated viable § 1983 claims notwithstanding the availability of state judicial review of the adverse Civil Service Commission. The opinion of the Court expressly refers to plaintiffs' choice to bring the federal § 1983 suit instead of pursuing the state court route, .... Yet none of the opinions in *Loudermill,* including' the dissenting opinion of Justice Rehnquist, the author of *Parratt,* cites to *Parratt.* It is apparent, therefore, that *Parratt* does not stand for the broad proposition ascribed to it by the district court, *i.e.,* that there is no deprivation of procedur-

al due process as long as there is a state remedy.

*Stana,* 775 F.2d at 129.

█ Here, plaintiff was entitled to a pre-termination hearing and there is nothing to suggest that a pre-termination hearing would have been impossible or impracticable. Thus, given the holdings of *Stana* and *Loudermill,* we do not find that defendants are entitled to judgment as a matter of law on plaintiff's procedural due process claim on exhaustion grounds, as his § 1983 action alleging a violation of his pre-termination procedural due process rights may be maintained in this court, notwithstanding the availability of state administrative remedies as well.

### 3. Plaintiff's Pre–Termination Procedural Due Process Claim

Defendants, citing *Gilbert v. Homar,* 520 U.S. 924, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997), submit that no pre-termination hearing was required in plaintiff's case. Alternatively, defendants argue that the December 23, 1998 conversation between counsel satisfies any requirement for a pre-termination hearing and that the court, by way of its February 1, 2001 Memorandum, incorrectly found in favor of plaintiff on his procedural due process claim. Defendants submit that the court erred given the contradiction between a portion of Finding of Fact ¶ 24 emphasized here which states: "During the December 23, 1998 conversation, Bonner did not list the numerous reasons for plaintiff's termination or ask Gismondi to relay termination reasons to plaintiff so that plaintiff had an opportunity to respond. *Bonner relayed to Gismondi four main reasons for plaintiff's termination,*" and the subsequent statement on page 19 that "no effort was made on behalf of defendants to notify plaintiff or Gismondi of the exact reasons

for plaintiff's termination or the evidence supporting those reasons."

■■ The standard for assessing a plaintiff's § 1983 procedural due process claim is well-settled.

> When a plaintiff sues under 42 U.S.C. § 1983 for a state actor's failure to provide procedural due process, we employ the 'familiar two stage analysis,' *Robb v. City of Philadelphia*, 733 F.2d 286, 292 (3d Cir.1984), inquiring (1) whether 'the asserted individual interests are encompassed within the fourteenth amendment's protection of life, liberty, or property;' and (2) whether the procedures available provided the plaintiff with 'due process of law.'

*Alvin*, 227 F.3d at 116. Public employees who can be discharged only for cause have a constitutionally protected property interest in continued employment and are entitled to procedural due process before having their employment terminated. *Gilbert*, 520 U.S. at 928–29, 117 S.Ct. 1807 (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 578, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 602–03, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)).

■ If the employee is to lose his or her employment, that process includes an informal, pre-termination hearing, to be followed by a more comprehensive post-termination hearing. *Loudermill*, 470 U.S. 532, 545–46, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The pre-termination hearing serves only as an initial check against mistaken decisions, and "need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story." *Gilbert*, 520 U.S. at 929, 117 S.Ct. 1807 (citing *Loudermill*, 470 U.S. at 546, 105 S.Ct. 1487). "[T]he purpose of a pre-termination hearing is to determine 'whether

there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'" *Gilbert*, 520 U.S. at 933, 117 S.Ct. 1807 (quoting *Loudermill*, 470 U.S. at 545–46, 105 S.Ct. 1487). Also, "'in those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending with pay.'" *Gilbert*, 520 U.S. at 929, 117 S.Ct. 1807 (quoting *Loudermill*, 470 U.S. at 544–45, 105 S.Ct. 1487). Notably, a governmental employee who is suspended with pay is not entitled to a pre-suspension hearing providing the employee with notice and an opportunity to be heard. *Gilbert*, 520 U.S. at 930–31, 117 S.Ct. 1807.

■ In this case, we reiterate as we did in our Memorandum dated September 22, 2000, that since plaintiff was suspended with pay, he was not entitled to a pre-suspension hearing given the holding in *Gilbert*. Since plaintiff did not receive notice of termination until January 12, 1999, and his status between December 17, 1998 and January 12, 1999 was suspension with pay, no hearing was necessary for that purpose. A pre-termination hearing was necessary, however, before January 14, 1999, the effective date of the termination. The facts relied on in our February 1, 2001 opinion finding in favor of plaintiff on his procedural due process claim were those encompassing the time period between December 17, 1998 and January 14, 1999, used to resolve whether communications between counsel were sufficient to constitute a pre-termination hearing. On reconsideration for purposes of defendants' instant motion, we find ample factual support for our finding that the December 23, 1998 conversation between counsel did not meet the requirements of a pre-termination hearing and that, more specifically, plaintiff was not afforded a constitutionally required pre-termination hearing.

December 23, 1998 was the first conversation between counsel for the parties.[12] At the outset, Bonner informed Gismondi that the decision to terminate plaintiff's employment had already been made. Bonner informed Gismondi of four of the eleven reasons found in plaintiff's January 12, 1999 notice of termination. Specifically, the complaints against plaintiff mentioned by Bonner during the December 23, 1998 conversation included the allegedly mandatory employee meetings with Operation Department staff held on December 10, 1998 and December 17, 1998; the alleged attempt to orchestrate a walkout; the scheduled meeting with an attorney; and plaintiff's alleged delay in producing an Operations Manual required by HUD. During this conversation, Bonner never apprised Gismondi of the evidence supporting any charges against plaintiff, and never asked her to relay the termination reasons to plaintiff so that he would have an opportunity to respond. Less than two hours after her conversation with Bonner, Gismondi contacted plaintiff by telephone and notified him of the Housing Authority's decision to terminate his employment and briefly mentioned some of the reasons Bonner had listed as the basis for its termination decision.

In an abundance of caution, we clarify the aforementioned statement cited by defendants. We noted in our February 1, 2001 opinion that, prior to January 12, 1999, defendants failed to "notify plaintiff or Gismondi of the exact reasons for plaintiff's termination." What we were referring to was our factual finding that, on December 23, 1998, Gismondi was apprised of *only four of the final eleven reasons* stated for the termination of plaintiff's employment. Regardless, even if plaintiff or

Gismondi had been notified of all eleven reasons for plaintiff's termination, defendants never provided any evidence to support those reasons, as required for pre-termination hearing purposes under *Loudermill.*

In addition, not only did plaintiff not receive notice of the substance of the final charges against him until January 12, 1999, there is no evidence to support a finding that plaintiff had any opportunity whatsoever to respond to the charges against him prior to the effective date of the termination of his employment on January 14, 1999.

Accordingly, we find that the December 23, 1998 conversation between Bonner and Gismondi in no way satisfied the procedural due process protections to which plaintiff was entitled. Defendants clearly violated plaintiff's right to procedural due process protection. Therefore, defendants' motion for judgment as a matter of law on plaintiff's procedural due process claim will be denied.

### 4. Plaintiff's First Amendment Claim

Defendants contend that plaintiff's complaints with regard to the Turnkey solicitation and the hiring of Severson were matters of intragovernmental operations and not matters of public concern and, therefore, that questions on those matters were improperly submitted to the jury. In support of their contention, defendants submit that the complaints made by plaintiff were motivated by self-interest and animus—evidencing a private dispute, not a matter of public concern. In addition, defendants contend that the court erred in according First Amendment protection to plaintiff's intent to confer with an attorney on the day of his suspension.

---

**12.** We rely on a review of the trial transcripts and point out that during the non-jury hearing on plaintiff's procedural due process claim, Gismondi consistently referred to detailed notes as well as phone records documenting her conversations with Bonner.

■ The United States Supreme Court's holding in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) governs our analysis for determining whether the complaints made by plaintiff were protected by the First Amendment. In so determining, "we must ascertain (1) whether the speech was on a matter of public concern; and (2) if it was, whether the government's interest in efficiency or effectiveness outweighs the value of the speech." *Poteat v. Harrisburg Sch. Dist.*, 33 F.Supp.2d 384, 394 (M.D.Pa.1999). *See also Azzaro v. County of Allegheny*, 110 F.3d 968, 976 (3d Cir.1997)(citing *Connick*, 461 U.S. at 147–150, 103 S.Ct. 1684).

■ The Third Circuit recently set forth a thorough standard of review for determining whether speech made by a public employee is a matter of public concern:

'A public employee's speech involves a matter of public concern if it can 'be fairly considered as relating to any matter of political, social or other concern to the community.' *Green [v. Phila. Hous. Auth.*, 105 F.3d 882,] 885, 885–86 [3d Cir.1997] (quoting *Connick*, 461 U.S. at 146 [103 S.Ct. 1684]). In this respect, we focus on the content, form, and context of the activity in question. *Connick*, 461 U.S. at 147–48 [103 S.Ct. 1684]; *Watters [v. City of Philadelphia*, 55 F.3d 886,] 892 [3d Cir.1995]. The content of the speech may involve a matter of public concern if it attempts 'to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials.' *Holder [v. City of Allentown*, 987 F.2d 188,] 195 [3d Cir.1993] (internal quotations and citations omitted); *see also Swineford [v. Snyder County Pa.*, 15 F.3d 1258,] 1271 [3d Cir.1994] ("[S]peech disclosing public officials' misfeasance is protected.").

*Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir.2001) (finding investigator's speech in connection with his internal investigation of fellow law enforcement officers' alleged buying of previously leased county vehicles at below market price was on matter of public concern). "Disclosing corruption, fraud, and illegality in a government agency is a matter of significant public concern." *Feldman v. Phila. Hous. Auth.*, 43 F.3d 823, 829 (3d Cir.1994) (citation omitted). "[A] court asked whether a public employee's speech related to a matter of public concern must determine whether expression of the kind at issue is of value to the process of self-governance." *Azzaro*, 110 F.3d at 977. Notably, given "the nature of their employment, speech by public employees is deemed to be speech about public concern when it relates to their employment so long as it is not speech 'upon matters of only personal interest.'" *Swineford*, 15 F.3d at 1271 (citation omitted).

In order for the court to best assess the threshold issue of whether the complaints made by plaintiff fall within the ambit of matters of public concern, we turn to other cases in which speech by other public employees was held to involve matters of public concern. *See Connick*, 461 U.S. at 148–153, 103 S.Ct. 1684 (survey questions circulated by plaintiff assistant district attorney to other employees concerning office transfer policy, office morale, need for grievance committee and level of confidence in supervisors involved personal grievance and not a matter of public concern; one question pertaining to whether employees felt pressure to work in political campaigns did touch on matter of public concern); *Azzaro*, 110 F.3d at 978–79 (county employee's report of sexual harassment by county official's assistant was a matter of public concern because

such harassment constituted discrimination by person "exercising authority in name of public official" and "would be relevant to the electorate's evaluation of the performance of the office of an elected official"); *Watters*, 55 F.3d at 895 (employee's statements in newspaper article expressing concern over lack of official policies covering counseling services for employee assistance program such at a police department involved a matter of public concern); and *Feldman*, 43 F.3d at 829 (former employee's highly critical internal audit report exposing governmental wrongdoing clearly pertained to a matter of public concern).[13]

 Review of the aforementioned cases compels the conclusion that plaintiff's complaints do not rise to the level of speech touching on matters of public concern. Plaintiff's complaints about Montgomery's failure to inform plaintiff of her relationship to Severson until after Severson was considered—and hired—for a position with the Housing Authority and her solicitation of $250.00 from Turnkey Construction involved conduct which he believed violated the Housing Authority's internal Personnel Policy sections entitled "Hiring Procedures and Criteria" and "Conflicts of Interest." As we did in our

opinion dated February 1, 2001, we find that the conduct forming the basis of plaintiff's complaints did not actually violate the Housing Authority's internal policy. *See* February 1, 2001, Memorandum and Order, at 22–24.[14] Regardless, the content of the statements do not sufficiently relate to any "political, social, or other concern to the community." *Connick*, 461 U.S. at 146, 103 S.Ct. 1684. Furthermore, the statements do not reveal any "corruption, fraud, [or] illegality" on behalf of the Housing Authority. *Feldman v. Phila. Hous. Auth.*, 43 F.3d 823, 829 (3d Cir. 1994). Accordingly, we simply cannot—and do not—find that the "issues clearly relate to matters of legitimate concern to the community," as asserted by plaintiff. *See* Plaintiff's Brief at 14.

Although the complaints made by plaintiff relate to matters of his employment, the record supports a finding that the nature of plaintiff's speech touched on matters of personal concern, as they were motivated, in part, by personal animus. Specifically, in considering the context in which the statements were made, testimony at trial revealed that plaintiff did not get along with, or particularly care for, Montgomery. According to Pepperman, plaintiff and Montgomery had "personality clashes." December 8, 2000, N.T. at 80.

---

**13.** Additional cases provided by *Watters* found the following speech by public employees to touch upon matters of public concern:

See e.g., *Pickering [v. Bd. of Educ.]*, 391 U.S. [563,] 566, [88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)] ... (letter to the editor criticizing Board of Education's allocation of school funds); *Mt. Healthy [City Sch. Dist. Bd. of Educ. v. Doyle]*, 429 U.S. [274,] 282 [97 S.Ct. 568, 50 L.Ed.2d 471 (1977)] ... (telephone call to a local radio station about memorandum on teacher dress codes); *Zamboni v. Stamler*, 847 F.2d 73, 75 (3d Cir.1988)(public criticism of proposed reorganization of prosecutor's office), ... *Johnson v. Lincoln University*, 776 F.2d 443, 452 (3d Cir.1985)(letters by university professor

to accreditation body alleging low academic standards in university); *Czurlanis [v. Albanese]*, 721 F.2d [98,] 100–01 [(3d Cir.1983)] (speeches at Board of Chosen Freeholders meetings criticizing practices of Division of Motor Vehicles); *Monsanto v. Quinn*, 674 F.2d 990, 996–97 (3d Cir.1982)(letters to tax commissioner criticizing management of tax division).

55 F.3d at 894.

**14.** Although these findings were discussed in the context of plaintiff's Whistleblower claim, we do not rely on our holding in favor of defendant on that claim in assessing defendants' instant challenge to the merit of plaintiff's First Amendment claim.

Ed Kohler, the Finance Director for the Housing Authority testified that plaintiff had made "negative statements" about Montgomery to him and other Housing Authority staff members. December 13, 2000, N.T. at 84. Particularly, plaintiff was "upset" about Montgomery's promotion to Executive Director in December of 1998. December 8, 2000, N.T. at 82. Upon learning that Montgomery was going to be Executive Director, plaintiff purportedly stated to Pepperman, "I can't stand it, I can't work here with her, I just can't do that." *Id.* at 84. The timing at which plaintiff launched his complaints indicates that they involved a private matter rather than matters of public concern. Notably, plaintiff made his first complaint about the Severson hire in 1996, after Severson was first hired. He did not raise the issue again until sometime in the spring of 1998 when he learned of Montgomery's appointment to Deputy Executive Director.[15] He again raised the issue in November of 1998, around the time that he learned of Montgomery's promotion to Executive Director. With respect to the Turnkey Construction solicitation, plaintiff raised his complaint at the time the solicitation was made in August of 1997. He did not raise the issue subsequently until the spring of 1998, again, at the time Montgomery was promoted to Deputy Executive Director.

▮ Complete reliance on the plaintiff's motivation for making the complaints is inappropriate. *See Rode v. Dellarciprete,* 845 F.2d 1195, 1201 (3d Cir.1988). However, "self-interest and animus may indicate the speech involves a private dispute rather than an issue of public concern." *Swineford,* 15 F.3d at 1272 (citing *Connick,* 461 U.S. at 148, 103 S.Ct. 1684). Here, the content of plaintiff's speech is not the kind sufficiently "of value to the process of self-governance," *Azzaro,* 110 F.3d at 977, and appears further to be based in part on personal animus towards Montgomery. Thus, we conclude that plaintiff's complaints involving the hiring of Severson and the solicitation from Turnkey Construction are not protected under the First Amendment and, thus, were erroneously submitted to the jury as part of plaintiff's First Amendment claim.[16]

Defendants next contend that the court erred in submitting to the jury the issue that defendants violated plaintiff's constitutional rights to confer with an attorney. Defendants submit that plaintiff was not intending to exercise any personal right in the matter but, rather, intended to meet with the attorney as a "problem solver" and as a representative of the Housing Authority. Plaintiff, on the other hand, submits he had a personal interest in obtaining legal advice and, as such, his conduct was worthy of First Amendment protection.

▮ "The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition." *Denius v. Dunlap,* 209 F.3d 944, 953 (7th Cir.2000) (citing *DeLoach v. Bevers,* 922 F.2d 618, 620 (10th Cir.1990); *Martin v. Lauer,* 686 F.2d 24, 32 (D.C.Cir.1982)). "[T]he First Amendment prohibits the state from interfering with collective action by individuals to seek legal advice and retain legal counsel." *Denius,* 209 F.3d at 954 (citations

---

15. The testimony at trial revealed that, prior to Montgomery's promotion to Deputy Executive Director, plaintiff had indicated to Pepperman that he was interested in the Deputy Executive Director position.

16. Because we find that plaintiff's statements do not constitute matters of public concern, we need not balance the Housing Authority's interest in efficiency or effectiveness against the value of plaintiff's speech as dictated by *Connick,* 461 U.S. at 147–150, 103 S.Ct. 1684.

omitted). "Likewise, the state cannot impede an individual's ability to consult with counsel on legal matters." *Id.* (citations omitted). "In sum, the First Amendment protects the right of an individual or group to consult with an attorney on any legal matter." *Id.*[17]

 Here, the record supports a finding that plaintiff's intent to meet with an attorney was entitled to protection under the First Amendment. Although the attorney meeting was scheduled by Ted Miller, other employees were advised of the meeting, December 5, 200, N.T. 42–43, and plaintiff intended to attend. December 13, 2000, N.T. 151. The primary issue concerning the employees in the Operations Department prior to their scheduling the attorney meeting was whether or not they would or could be placed on probation. December 6, 2000, N.T. 21; December 7, 2000, N.T. 60–62; December 12, 2000, N.T. 171. Although plaintiff never testified that he was going to see the attorney to discuss a personal matter, the probation issue directly affected him at least as much, if not more, than other employees. December 5, 2000, N.T. 31–32. According to plaintiff, he testified that he hoped through the attorney meeting "to resolve the issues and [to] learn." December 6, 2000, N.T. 79.[18]

Given the facts presented, it is clear that plaintiff's intent to seek legal counsel was protected under the First Amendment and the court did not err in submitting the issue to the jury.

Accordingly, defendants are entitled to judgment as a matter of law on plaintiff's First Amendment claims relating to the hiring of Severson and the Turnkey Construction solicitation, as his complaints on those matters did not touch on matters of public concern. We will deny defendants' motion for judgment as a matter of law with respect to plaintiff's First Amendment claim on the issue of his First Amendment right to seek legal advice from an attorney.

### 5. Defendants' Objection To The Special Verdict Question Form

In their reply brief, defendants submit for the first time that if the court finds that certain First Amendment issues should not have been submitted to the jury, as we did in the prior section pertaining to plaintiff's complaints regarding Severson and Turnkey Construction, they are entitled to a new trial based on their objection to the special verdict form submitted to the jury. Defendants' argument is as follows:

> After resolving the First Amendment submissions, the jury was given [ ] special verdict question [# 2] that stated, "Would the Defendants have terminated plaintiff Cipriani's employment even in the absence of his activity protected under the First Amendment." The jury responded "No" to that question. However, it is unknown and would be purely speculative to conclude that the answer to that question would have been No had any of the three First Amendment claims not been submitted to the jury.

**17.** In this circuit, the leading case on the issue of the right to consult with an attorney under the First Amendment stands for the proposition that the petition clause of the First Amendment protects a public employee's right to pursue a lawsuit or grievance even if it addresses a matter of private concern as long as it is of the sort that constitutes a "petition" within the meaning of the First Amendment *San Filippo v. Bongiovanni,* 30 F.3d 424 (3d Cir.1994).

**18.** The court was provided only a partial transcript of December 6, 2000. Accordingly this citation was unavailable and, therefore, was adopted from Plaintiff's Brief at 17.

For example, there is absolutely no way to determine if the answer to Question No. 2 would have been No if the attorney's meeting issue had not been submitted to the jury. Likewise, the same argument can be made for the submission to the jury of the Turn Key [sic] solicitation and the hiring of Severeson [sic].

Defendants' Reply Brief at 4.

■ "[W]here a defendant fails to object to the form and language of special verdict forms or to the jury charges, before closing arguments or at the close of charging before the jury retires to deliberations, and the form has been submitted to counsel, objections are waived." *Neely v. Club Med Mgmt. Servs.*, 63 F.3d 166, 200 (3d Cir.1995) (citing FED. R. CIV. P. 51; further citation omitted). FED. R. CIV. P. 51 states in relevant part:

> At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests .... No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection ....

*Id.*

■ Defendants never raised their objection to the special verdict form submitted to the jury prior to the submission of their reply brief. By not requesting that the jury consider their affirmative defense separately for each of the three First Amendment activities involved, they have waived their objection and are not entitled to a new trial based on our prior holding concerning plaintiff's complaints under the First Amendment.

### 6. The Court's Failure To Allow Defendants' Good Faith Defense

Defendants argue that the court erred in refusing to allow their "good faith defense" to plaintiff's First Amendment claim. Specifically, they contend that they should have been able to present that if the Housing Authority reasonably believed that plaintiff made untrue statements to the staff regarding probationary status and/or statements regarding a staff walk out, that plaintiff could not recover on his First Amendment claim. *See* Defendants' Points for Charge (record doc. no. 81).

■ The appropriate burden of proof in a First Amendment retaliation case is fully set forth by the Third Circuit in *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir.2000):

> In a First Amendment retaliation case, the plaintiff has the initial burden of showing that his constitutionally protected conduct was a 'substantial' or 'motivating factor' in the relevant decision. *Mount Healthy*, 429 U.S. at 287, [97 S.Ct. 568] (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 270–271 & n. 21, 97 S.Ct. 555, 50 L.Ed.2d 450 [ ] (1977)). Once the plaintiff carries this burden, the burden shifts to the defendant to show 'by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct.' *Id.*

*Suppan*, 203 F.3d at 235.

In this case, the court properly charged the jury on the applicable burden of proof pertaining to plaintiff's First Amendment claim. Accordingly, the court did not err in refusing defendants' request to submit a good faith defense, and granting defendants' judgment as a matter of law or, in the alternative, a new trial on this basis is inappropriate.

### 7. The Exclusion Of Evidence Of Conversations Between Counsel

Defendants submit that the court erroneously excluded evidence of conversations between counsel for the parties between December 17, 1998 and January 12, 1999. This argument relates to plaintiff's procedural due process claim—a claim decided by the court, not the jury. Specifically, defendants are referring to the conversations between Bonner and Gismondi on December 23, 1998 and December 31, 1998. Defendants submit that without evidence of these conversations, the jury was led to believe that plaintiff was placed on administrative leave on December 17, 1998, and that there was no further contact with him until he received his termination letter on January 12, 1999. *See* December 12, 2000, N.T. 150–51.

Notably, however, defendants agreed at trial that no such conversations would be referred to in front of the jury. Indeed, a review of the record reveals the following colloquy:

> MS. GISMONDI: Yes, Judge. Immediately before the break I believe Mr. Orso [19] was beginning to ask Mrs. Montgomery some questions about decisions having to do with—and the timing of decisions having to do with Mr. Cipriani's termination, and I just want to make certain that we're not going to get into testimony that implicates mine and Mr. Bonner's testimony,[20] or that they put on evidence that I would not be able to refute other than through my own testimony.
>
> THE COURT: I can't imagine they would be doing that. We're not talking about—there will be no—no testimony

with respect to attorney conversations, . . . .

> MR. ORSO: Of course.
>
> THE COURT: Okay.

December 12, 2000, N.T. 57–58.

In revisiting the issue, the court stated:

> I think that there's no dispute as to the fact that the conversations took place. I mean, I think we all agree with that. And therefore under [Fed.R.Evid.] 201 is not one subject to reasonable dispute. Mr. Orso cited [Rule] 201(d) to the [c]ourt that says when mandatory, and it says a[c]ourt shall take judicial notice if requested by the party and supplied with the necessary information.
>
> Now, I, however, interpret [R]ule 201's mandatory language in clause (d), as with all evidence, to be subject to Rule 403. And that even though it doesn't say that in 201 itself, 403 is—you know, really is a rule that's applicable almost across the board, and the basis for my ruling the other day, and which I'll repeat, is 403.
>
> I have serious questions as to any relevance of the information with respect to the issues to be presented to the jury, but I further find that such probative value as it might have is substantially outweighed by the danger of confusion of the issues and misleading the jury with respect to those issues that they are to be presented with.

December 15, 2000, N.T. 5–6.

Obviously, defendants' agreement during the course of trial to exclude evidence of conversations between counsel for the parties significantly undercuts their present argument. Additionally, "a trial judge is given very substantial discretion when

---

**19.** Mr. Joseph Orso is co-counsel for defendants.

**20.** Counsel is referring to the bench trial on plaintiff's procedural due process claim where Bonner and Gismondi testified.

striking a [FED. R. EVID.] 403 balance ....." *Hurley v. Atlantic City Police Dept.*, 174 F.3d 95, 110 n. 10 (3d Cir.1999) (citing *United States v. Eufrasio*, 935 F.2d 553, 572 (3d Cir.1991)).

Accordingly, defendants' argument fails, and they are not entitled to judgment as a matter of law or, in the alternative, a new trial on this issue.

### 8. Qualified Immunity

Defendants contend that the court erred by denying Pepperman and Montgomery qualified immunity on plaintiff's First Amendment claim.

 In *Rouse v. Plantier*, the Third Circuit described a qualified immunity defense:

> Under this doctrine, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' *Harlow v. Fitzgerald*, 457 U.S. 800, 818 [102 S.Ct. 2727, 73 L.Ed.2d 396] (1982). 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' *Anderson v. Creighton*, 483 U.S. 635, 640 [107 S.Ct. 3034, 97 L.Ed.2d 523] (1987); *see also Acierno v. Cloutier*, 40 F.3d 597, 616 (3d Cir.1994) (en banc).

182 F.3d 192, 196 (3d Cir.1999).

The relevant inquiry was recently set forth by the United States Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). Specifically, we must first consider whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [government official's] conduct violated a constitutional right?" *Id.* "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* The latter inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition ....." *Id.*

 "[A] court must deny the claim [for qualified immunity] if the law is clearly established, 'since a reasonably competent public official should know the law governing his conduct' unless [she] can either demonstrate extraordinary circumstances or that [she] 'neither knew nor should have known' about the legal right in question." *Gruenke v. Seip*, 225 F.3d 290, 299 (3d Cir.2000) (quoting *Harlow*, 457 U.S. at 818–19, 102 S.Ct. 2727).

 As demonstrated above, plaintiff's intent to consult with an attorney is protected conduct under the First Amendment. The record is clear—and the jury determined—that plaintiff's employment was terminated, in part, because of his expressed intent to meet with an attorney. Indeed, that conduct was provided as a reason for plaintiff's discharge during the very first conversation between counsel for the parties on December 23, 1998.[21] Thus, in assessing the facts in a light most favorable to plaintiff, plaintiff has established that defendants violated his constitutional right to seek legal advice.

The law on First Amendment retaliation was clearly established at the time plaintiff was discharged in January of 1999. Indeed, as of 1982, the law was clearly established that a public employee, such as plaintiff, could not be retaliated against for exercising his rights under the First Amendment. *See Baldassare v. New Jersey*, 250 F.3d 188, 201 (3d Cir.2001) (citing

---

**21.** See our discussion of plaintiff's procedural due process claim above.

*Zamboni v. Stamler,* 847 F.2d 73, 80 n. 7 (3d Cir.1988)). No reasonable governmental official in defendants' position could have believed that retaliating against plaintiff for his expressed intent to exercise his constitutional right to consult an attorney was appropriate conduct under the First Amendment. As such, we must deny the individual defendants' claim for qualified immunity unless they can "demonstrate extraordinary circumstances or that [they] 'neither knew nor should have known' about the legal right in question." *Gruenke,* 225 at 299.

Defendants assert that since plaintiff's complaints did not touch on matters of public concern, it was objectively reasonable for Pepperman and Montgomery to believe that they did not violate clearly established First Amendment retaliation law. This argument fails to acknowledge their discharge of plaintiff for his exercise of his First Amendment right to seek legal advice about Housing Authority employment matters. Further, defendants have not demonstrated—or alleged—any extraordinary circumstances that would merit a finding of qualified immunity in their favor.

Accordingly, the court did not err in denying defendants' Pepperman and Montgomery claim for qualified immunity.

### IV. DEFENDANTS' MOTION FOR A NEW TRIAL

We shall also rule on defendants' motion for a new trial with respect to plaintiff's First Amendment claim. This comports with FED. R. CIV. P. 50(c)(1), which provides that when a motion for judgment n.o.v. is granted "the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed." *Id.*

The standard of review on a motion for new trial is set forth above. "[A] court, in the exercise of discretion, may grant a new trial if, inter alia, the jury's verdict was against the weight of the evidence, or if substantial errors occurred in the admission or exclusion of evidence or in the charge to the jury." *Kidd v. Commonwealth of Pennsylvania, Bureau of Liquor Control Enforcement,* No. Civ.A. 97–CV–5577, 2001 WL 1159770, at *1 (E.D.Pa. Aug.21, 2001)(citing *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940)).

■ Our earlier analysis regarding plaintiff's First Amendment claims pertaining to his complaints about the hiring of Severson and the solicitation from Turnkey Construction indicates that the complaints do not touch on matters of public concern, were not entitled to protection under the First Amendment, and were, therefore, erroneously submitted to the jury as part of plaintiff's First Amendment claim.

However, we find that, within the provisions of FED. R. CIV. P. 50(c)(1), there needs to be a denial of defendants' motion for a new trial if the judgment entered as a result of the granting of the instant motion for judgment notwithstanding the verdict is vacated or reversed. We find no basis for a new trial should the Third Circuit find that we erred in concluding that plaintiff's complaints about Montgomery were not protected by the First Amendment. The First Amendment issues were already fully litigated at trial. There is nothing to suggest that the jury's verdict was against the weight of the evidence, that substantial errors occurred in the admission or exclusion of evidence, or that, if the complaints were protected speech, there was an improper charge to the jury.

Accordingly, defendants' motion for a new trial will be denied.

## V. PLAINTIFF'S MOTION FOR RECONSIDERATION

In it's memorandum dated February 1, 2001, the court found for defendants' with respect to plaintiff's Whistleblower claim. Specifically, we found that plaintiff's complaints about Montgomery's failure to bring to light her relationship to Severson and her solicitation from Turnkey Construction did not fall within the ambit of "wrongdoing" as provided under § 1422 of the Whistleblower Law.[22] Plaintiff argues that the court erred as a matter of law in holding that plaintiff's good faith reports of a suspected wrongdoing are excluded from protection under Pennsylvania's Whistleblower Law, 43 Pa. Stat. Ann. §§ 1421 et seq. Specifically, plaintiff contends that the court's interpretation of the law as applied to the factual findings in plaintiff's case constitutes a clear error of law.

"The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Harsco v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir.1986) (citing *Keene Corp. v. Int'l Fid. Ins. Co.*, 561 F.Supp. 656, 665 (N.D.Ill.1983)). A court may alter or amend its judgment if the party seeking reconsideration shows at least one of the following "(1) an intervening change in the controlling law; (2) the availability of new evidence that was [previously] not available ...; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café v. Quinte-*

ros, 176 F.3d 669, 677 (3d Cir.1999) (citing *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir.1995)).

Pennsylvania's Whistleblower Law, 43 Pa. Stat. Ann. § 1423(a), provides:

> No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

In order for an employee to succeed on a claim under the Pennsylvania Whistleblower Law, he must show not only that he filed a good faith report of wrongdoing or waste, he must also establish by concrete facts or surrounding circumstances that the report led to the termination of his employment. *See Lutz v. Springettsbury Township*, 667 A.2d 251, 253 (Pa.Commw.Ct.1995); *Gray v. Hafer*, 168 Pa.Cmwlth. 613, 651 A.2d 221, 225 (1994).[23] "The plain intent of the [Whistleblower] Law is to protect from retaliation employees who make good-faith efforts to alert authorities to governmental waste and wrongdoing." *Podgurski v. Pennsylvania State Univ.*, 722 A.2d 730, 732 (Pa.Super.1998) (quoting *Rodgers v. Pa. Dep't of Corrs.*, 659 A.2d 63, 66 (Pa. Cmmw.Ct.1995)).

---

**22.** Plaintiff opts not to request reconsideration of the court's holding pertaining to the Housing Authority's intent to put employees on probation. As such, we do not discuss the probation issue here.

**23.** As we noted in our February 1, 2001 memorandum at 25, "the evidence at trial supported a jury finding that plaintiff was dis-

charged due to (1) his complaints concerning Severson, (2) his complaints concerning Montgomery's solicitation, and (3) his intent to seek legal advice from an attorney." Thus, we do not discuss herein the causal connection between plaintiff's complaints and his termination.

"Wrongdoing" is defined under § 1422 of the Law as "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." *Podgurski,* 722 A.2d at 732 (citing *Riggio v. Burns,* 711 A.2d 497 (Pa.Super.1998)(en banc)). When discussing "wrongdoing," the Commonwealth Court of Pennsylvania held:

> Within the definition of 'wrongdoing', there is a requirement that the violation of the law or regulation be one that is designed to protect the interest of the public or employer. While the definition uses the phrase 'to protect the interest of the public', and that could be interpreted to apply to any statute or ordinance as used in the context of retaliation taken by an employer because of an employee's work performance, that requirement means that a statute or regulation is of the type that the employer is charged to enforce for the good of the public or is one dealing with the internal administration of the governmental employer in question.

*Gray,* 651 A.2d at 224.

Here, plaintiff's argument hinges primarily on the definition of a "good faith report" defined under § 1422 of the Whistleblower Law as: "[a] report of conduct defined in this act as wrongdoing or waste which is made without malice or consideration of personal benefit and which the person making the report has *reasonable cause to believe is true.*" (emphasis added). Plaintiff relies on a portion of *Lutz* that states: "Generally, [a good faith report] is one initiated by the employee based upon that employee's *suspicion* of wrongdoing or waste." 667 A.2d at 253–54. The plaintiff also points out the statute's introductory passage under § 1421 which describes the Whistleblower Law as: "[a]n Act providing protection for employees who report a violation or *suspected violation of State, local, or Federal law.*" (emphasis added). Curiously, however, neither of plaintiff's complaints at issue involve a suspected violation of state, local or federal law, or even the Housing Authority's internal policy.

We find that the court did not commit clear error of law in holding that the conduct complained of simply does not rise to the level of a "wrongdoing" under the Whistleblower Law. In order to clarify further why we believe that the conduct complained of by plaintiff does not fall within the confines of the Whistleblower Law, we look to Pennsylvania case law for guidance. *Podgurski* and *Golaschevsky* involve complaints of conduct that was significantly more indicative of a "wrongdoing" under the statute than the complaints launched by plaintiff in this case.

For example, in *Podgurski,* the plaintiff's complaints against her co-workers at Pennsylvania State University included expenditures of unnecessary funds, dismissal of employees absent any reason, hiring of employees without proper qualification, false reporting of hours worked, and improper conduct by co-employees while at work. *Id.* at 732. The court stated: "This conduct, if proven, falls well within the ambit of the statute defining wrongdoing, as these actions would relate to the employer's duty to enforce administrative policies protecting their interest." *Id.*

In *Golaschevsky v. Commonwealth,* the conduct complained of was that co-employees for the state Department of Environmental Protection were using computer software in violation of federal copyright laws. 554 Pa. 157, 720 A.2d 757 (1998). The court stated that, although the conduct complained of was a violation of federal law, there was a question as to wheth-

er the alleged violations fell within the "technical or minimal" exception to the definition of "wrongdoing." *Id.*, 720 A.2d at 759. The court declined to reach that issue, however, as plaintiff had failed to establish a causal connection between his report and subsequent termination. *Id.*

██ Plaintiff claims that he reasonably believed the hiring of Severson and the solicitation from Turnkey construction violated the Housing Authority's internal policy; however, the evidence discussed above suggesting animosity between plaintiff and Montgomery compromises any finding that his complaints were made in "good faith" as defined by the Whistleblower Law. As previously stated, in order to qualify as a good faith report, the report must be made "without malice or consideration of personal benefit." 43 Pa. Stat. Ann. § 1422.

We do not believe that we previously committed clear error of law in our interpretation of the facts and applicable law in this case. Accordingly, plaintiff's motion for reconsideration will be denied and our prior judgment in favor of defendants on plaintiff's Whistleblower Claim will stand.

## VI. DAMAGES

Neither party addressed the issue of damages in the event we grant defendants' motion for judgment as a matter of law on any of plaintiff's claims. The jury returned a verdict in favor of plaintiff in the amount of $875,000.00 for defendants' violation of plaintiff's First Amendment rights. As discussed above, plaintiff's First Amendment claims involve three alternate theories of liability. We do not overturn the jury's finding that defendants are liable for violating plaintiff's First Amendment right to seek legal advice from an attorney. Thus, defendants remain liable for violating one of plaintiff's rights under the First Amendment. Entry of judgment in favor of defendants on the other two theories of liability under the First Amendment does not alter the damages due plaintiff. Thus, the damage award in the amount of $875,000.00 will stand.

## VII. CONCLUSION

Based on the foregoing, we will grant defendants' judgment as a matter of law on plaintiff's First Amendment claims relating to the hiring of Severson and the Turnkey Construction solicitation since his complaints on those matters did not touch on matters of public concern. Defendants' motion for a new trial on plaintiff's First Amendment claim on those issues will be denied if the judgment entered as a result of defendants' instant motion for judgment notwithstanding the verdict is vacated or reversed.

We will deny defendants' motion for judgment as a matter of law with respect to plaintiff's First Amendment claim on the issue of his First Amendment right to seek legal advice from an attorney.

We will deny defendants' motion for post-trial relief in all other respects.

Plaintiff's motion for reconsideration of our finding in favor of defendants on plaintiff's Whistleblower claim will be denied.

An appropriate order will issue.

### ORDER # 1

For the reasons set forth in the accompanying memorandum,

**IT IS ORDERED THAT:**

1. Defendants' motion for judgment as a matter of law or, in the alternative, a new trial (record doc. no. 109, filed February 12, 2001) is granted in part and denied in part as follows:

1.1 Pursuant to FED. R. CIV. P. 50(b), defendants' motion is granted with respect

to plaintiffs' First Amendment claims pertaining to his complaints about the hiring of Dean Severson and Montgomery's solicitation of funds from Turnkey Construction.

1.2 Pursuant to FED. R. CIV. P. 50(c)(1), defendants' motion for a new trial on plaintiff's First Amendment claim on the issues listed in ¶ 1.1 is denied if the judgment entered as a result of defendants' instant motion for judgment notwithstanding the verdict is vacated or reversed.

1.3 Defendants' motion for judgment as a matter of law or, in the alternative, a new trial, is denied with respect to all other issues not covered in ¶ 1.1.

2. Plaintiff's motion for reconsideration of the court's February 1, 2001 order finding in favor of defendants on plaintiff's claim under Pennsylvania's Whistleblower Law (record doc. no. 146, filed June 29, 2001) is denied.

3. The case shall remain open for consideration of plaintiff's final supplemental motion for reasonable attorneys' fees and expenses incurred after July 5, 2001, and the time to file an appeal shall run from the entry of the court's order disposing of that motion, in accordance with FED. R. APP. P. 4(a)(4)(A)(iii).